HENRIETTA D., Nidia S., Simone A., Ezzard S., John R.,and Pedro R., on behalf of themselves and others similarly situated, Plaintiffs,

v.

Rudolph GIULIANI, Mayor of the City of New York, Marva Hammons, Administrator of the New York City Human Resources Administration and Commissioner of the New York City Department of Social Services, and Mary E. Glass, Commissioner of the New York State Department of Social Services, Defendants.

No. 95 CV 0641(SJ).

United States District Court, E.D. New York.

Sept. 18, 2000.

---

Winthrop, Stimson, Putnam & Roberts, New York, NY (Susan J. Kohlmann, Karen B. Dine, David W. Oakland, of Counsel), Housing Works, Inc., New York, NY (Armen H. Merjian, Virginia G. Shubert, of Counsel), HIV Law Project, New York, NY (Victoria Neilson, of Counsel), for Plaintiffs.

Michael D. Hess, The City of New York Law Department, New York, NY (K. Lesli Logorner, Lisa Brauner, Ruby Bradley, Paul Marks, of Counsel), for Defendant City of New York.

Elliot Spitzer, Attorney General of the State of New York, NY (Vincent Leong, Anne H. Bomser, Assistant Attorney General, of Counsel), for Defendant State of New York.

## MEMORANDUM AND ORDER

JOHNSON, District Judge.

This class action is brought by New York City residents with AIDS or HIV-related illnesses seeking equal and meaningful access to publicly subsidized benefits. Plaintiffs sued city and state officials, claiming violations of the Americans with Disabilities Act ("ADA"), the Medicaid Act, Section 504 of the Rehabilitation Act of 1974, and other violations of state and federal laws. After a lengthy period of discovery and motion practice, this Court held a bench trial on the merits of this case on May 1, 2000, May 2, 2000, June 20, 2000, June 21, 2000, and June 22, 2000. Based on the evidence and testimony presented at trial, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### Nature of the Case

1. Plaintiffs commenced this action against defendants for failure to provide meaningful and equal access to public benefits and services as required by the Americans with Disabilities Act and the Rehabilitation Act, and for failure to comply with numerous federal and state laws, including the Social Security Act, the Medicaid Act, the New York Social Services Law, and various regulations under these acts. Second Am. Compl. ¶¶ 1–2.

2. This Court has subject matter jurisdiction over the federal law claims against both City and State defendants pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over the state law claims against only the City defendants pursuant to 28 U.S.C. § 1367(a). *See* Sec-

ond Am. Compl. ¶¶ 6–8; Joint Pre–Trial Order at 3; *Henrietta D. v. Giuliani*, 81 F.Supp.2d 425, 428 (E.D.N.Y.2000).

3. The Division of AIDS Services and Income Support ("DASIS"), a division of the New York City Human Resources Administration ("HRA"), is the means for indigent individuals living with AIDS or clinical/symptomatic HIV to access critical subsistence benefits and services offered by City and State defendants. Rather than requiring persons with AIDS or clinical/symptomatic HIV illness to access the many programs administered by HRA on their own, DASIS case managers are responsible for assisting clients in applying for and maintaining public assistance, Medicaid, Food Stamps, housing, Social Security benefits, and other benefits and services. DASIS was known as the Division of AIDS Services ("DAS") until it was consolidated with HRA's Income Support division in 1997.

*Plaintiff Class*

4. This Court certified the original named plaintiffs as representatives of a class of "all DAS-eligible persons" who seek public assistance benefits and services. In order to be a DASIS client, an individual must be: a New York City resident who is "Medicaid eligible," and has been diagnosed with clinical/systematic HIV illness or AIDS. *Henrietta D. v. Giuliani*, 1996 U.S. Dist. LEXIS 22373 at *47; Tr. at 662: 9–12.

5. Pursuant to stipulation between the parties, Henry Bradley, Owen–Pahl Greene and Richard Torres intervened in this action "as representative named plaintiffs." Pre–Trial Odr. at 10 and Ex. 4.[1]

*AIDS and the Need for Reasonable Modifications*

6. People living with HIV and AIDS develop numerous illnesses and physical conditions not found in the general population, and experience manifestations of common illnesses that are much more aggressive, recurrent, and difficult to treat.

Infections and cancers spread rapidly in a person whose immune system has been compromised, and the effectiveness of medicine is diminished by nutritional problems that limit the body's ability to absorb what is ingested. Illnesses that are not lethal to the general population can kill an HIV-infected person. For all these reasons, persons with AIDS and HIV-related disease experience serious functional limitations that make it extremely difficult, if not impossible in some cases, to negotiate the complicated City social service system on their own. *See Henrietta D. v. Giuliani*, 1996 U.S.Dist. LEXIS 22373 at *4–5; Tr. at 435:12–444:21.

7. As the immune system deteriorates, persons infected with HIV progress from being asymptomatic to developing symptoms such as weight loss, severe gynecological infections, chronic diarrhea, and fatigue. Eventually, HIV and AIDS strips the body of all defenses, leaving the infected person unable to fend off or combat new and existing infection and illness. At this later stage of HIV infection, patients commonly develop "opportunistic infections" such as PCP pneumonia, cryptococcal meningitis, and Kaposi's Sarcoma, diseases particular to persons with compromised immune systems. These illnesses and infections eventually cause death. Tr. at 435:12–444:21.

8. The opportunistic infections and chronic conditions that result from a weakened immune system limit the HIV-infected person's ability to engage in regular activities of daily life such as traveling, standing in line, attending scheduled appointments, completing paper work, and otherwise negotiating medical and social service bureaucracies. Some examples of these conditions include: cytomegalovirus (CMV) retinitis, a visual impairment that often results in blindness; severe wasting syndrome, which causes chronic diarrhea, extreme fatigue and, in some instances, gait impairment; peripheral neuropathy, a

---

1. Henrietta D. died shortly after this case was filed on February 28, 1995.

disturbance of the peripheral nervous system that causes numbness or tingling of the hands and feet, weakness in the legs, arms and hands, and severe pain that can interfere with the ability to walk; and AIDS dementia complex, a neurocognitive dysfunction that can interfere with the ability to understand written materials and/or fill out forms. Tr. at 435:12–444:21.

9. Functional limitations also develop from the primary drugs used to combat AIDS and HIV-related disease, among them AZT, DDI, ddC, protease inhibitors, and anti-neoplastic agents. These medications result in anemia and other side effects, with concomitant fatigue, shortness of breath, and other physical limitations. An individual receiving this common regime of prescription drugs likely will be restricted in his or her ability to walk, stand, or travel. Other side effects include enhanced neuropathy, diarrhea, nausea, and vomiting. Tr. at 442:6–21.

10. The latest medical development in the fight against HIV disease is the prescription of so-called "drug cocktails," which consist of two older AIDS drugs, such as AZT and 3TC, and the latest antiviral drugs, protease inhibitors. These drugs create added complications for patients including extremely cumbersome treatment regimens and serious side effects, such as nausea and gastrointestinal symptoms. The drugs must be taken several times a day, some on an empty stomach and some after meals, and treatment regimens can include up to sixty pills a day. Additionally, some of these drugs require refrigeration. Tr. at 441:24–444:11.

11. People living with AIDS and HIV also have a particularly hard time obtaining adequate nutrition. Illness and infection often limit the appetite and the body's ability to absorb nutrients, and common HIV-related conditions like oral thrush can physically limit the ability to swallow. Nausea, a common side effect of drugs used to treat AIDS and HIV infection, can also result in an inability to eat properly.

Due to HIV-related disease, many HIV-infected persons have dietary restrictions. These nutritional restrictions can be difficult or impossible to maintain. Poverty, limited mobility, and limited resources result in limited access to fresh, high-quality food, and necessary dietary supplements. Pl.Ex. 13, at 3–4.

12. Stress is another critical problem faced by people living with AIDS and HIV. HIV-infected persons necessarily struggle with many stresses in their lives, including the likelihood of early death, management of a multitude of symptoms and medications, the future welfare of their children, rejection of friends and family, stigma, and discrimination. The added stress of lack of housing, food, medical care, or other basic survival services that indigent people face poses a serious threat to health. Medical evidence suggests that stress causes further weakening of the immune system in HIV-infected persons, making it even more difficult to fight illnesses and infections. Tr. at 444:12–21.

13. The requirement that persons with AIDS and advanced HIV disease travel to and wait in infection-ridden public waiting rooms can be dangerous, and even life-threatening, for this population, all of whom suffer from severely weakened immune systems. Persons with AIDS, for example, are highly susceptible to tuberculosis and other infectious diseases. Thus, persons with AIDS and advanced HIV disease require medically appropriate conditions in which to establish, receive, and maintain their benefits, as well as medically appropriate housing. Tr. at 436:5–440:23.

*Witnesses at Trial*

Henry Bradley

14. Henry Bradley is a fifty-one year old man who has been disabled with AIDS since 1983. Tr. at 40:15–22. As a result of his disability, he suffers from symptoms including numbness in his extremities, fungal infections that cause his teeth and nails to fall out, and severe rashes. To control

the disease, Mr. Bradley currently follows a medication regimen that requires taking fifty-one different tablets, plus liquid supplements, daily. Mr Bradley experiences certain side effects from the medication, including loss of bowel control, blurred vision, and occasional loss of short-term memory. Tr. at 41:6–43:9. While a DASIS client, Mr. Bradley has slept poorly, suffering from chills and sweats during the night, and he has lost over thirty pounds. *See* Def. Ex. S at ¶ 24.

15. In 1993 and 1994, Mr. Bradley resided at 775 Riverside Drive. Tr. at 45:7–9. After initially funding Mr. Bradley's housing, DASIS closed his case without notice in February, 1994. Tr. at 50:16–51:1. *See* P.Ex. 33. Mr. Bradley sought a conference with DASIS, but was refused and instead had to file for a fair hearing. The fair hearing decision in his favor ordered DASIS to reopen the case, pay the benefits due retroactively, and to notify Mr. Bradley about any further decisions. Tr. at 51:20–53:2.

16. Despite the fair hearing decision, DASIS did not pay the rent arrears and Mr. Bradley lost his apartment. Tr. at 53:9–14. During this time, Mr. Bradley's Medicaid was not active, and he was unable to maintain his medication regimen. Tr. at 54:1–4.

17. In November 1994, DASIS did pay the overdue benefits to Mr. Bradley. However, DASIS then immediately closed his case again without notice.[2] Tr. at 54:14–55:23. During this time, DASIS knew where to reach Mr. Bradley. 56:7–14. *See* Pl.Ex. 33.

18. From November 1994 to April 1995, Mr. Bradley was without shelter allowance, cash assistance, food stamps, or medical assistance. During this time without public benefits, Mr. Bradley relied pri-

marily on church charity in order to live. Again he was unable to maintain his medication regimen for this time period, and his health deteriorated from the constant worry about day-to-day survival. Tr. at 56:25–57:20. *See* Def. Ex. S at ¶¶ 8, 24.

19. Each time Mr. Bradley won a fair hearing decision, DASIS employees would direct Mr. Bradley to take his complaints to a noncompliance center to file a complaint. Mr. Bradley was forced to wait upon arrival and would eventually receive a computer printout that would describe what should be done to achieve DASIS' compliance. Then, he would be instructed by the staff to take the printout to the liaison office and to await further contact. This further contact never occurred. Mr. Bradley would do this once every twenty or thirty days with no result. Tr. at 58:21–59:11.

20. Although Mr. Bradley sought DASIS' assistance in securing a permanent apartment, no help was forthcoming. When he independently found an apartment, he brought the lease to his case manager at DASIS shortly before mid-August 1995; Mr. Bradley understood that his application would be processed. Tr. at 59:17–60:12. Instead, his case was closed for a third time, without notice, on August 14, 1995. Mr. Bradley did not learn of this closure until he discovered that he lost the apartment because DASIS had not processed the application. Tr. at 61:21–62:8.

21. Mr. Bradley again contacted more than twenty people at DASIS in an attempt to have a conference and avoid the delays caused by seeking a fair hearing and then seeking to force compliance with the decisions; DASIS refused him every time without explanation. Tr. at 63:3–14. From August 1995 to July 1996, Mr. Bradley did not receive any benefits. Mr.

---

2. At trial, City defendants produced a witness as evidence that on one occasion, Mr. Bradley received notice on the acknowledgment form he signed when he picked up his check. However, because the Fair Hearing decision reversing City defendants' actions has already determined the inadequacy of this notice, this evidence does not bear on this case. *See, e.g.,* Pl.Ex. 59 at 2, ¶¶ 2 and 3 (finding "the Agency discontinued ... without notice" public assistance, Medicaid and Food Stamp benefits).

Bradley survived by depending on different charitable organizations and churches. His Medicaid was affected by the case closing and he was not able to follow his medication regime for over two years. As a result, his health deteriorated, affecting his vision, and multiplying his regimen from 3 tablets per day to seventeen tablets three times per day. Tr. at 64:18–65:23. *See* Def. Ex. S at ¶ 24.

22. Mr. Bradley sought a fair hearing and received a favorable determination in July, 1996. DASIS was ordered to restore his benefits retroactively, reversing the discontinuance of his medical assistance benefits and food stamps. However, in September 1996 DASIS complied with the decision for only one day and then closed the case the next day for a fourth time without notice to Mr. Bradley. Tr. at 69:14–70:15.

23. Mr. Bradley did not know why his case was closed yet again. Tr. at 71:6–15. In questioning different people at DASIS, he received different answers regarding his case status. Tr. at 71:25–72:12. When he sought help from the noncompliance unit, he received the same chain of instructions as before: receive a computer printout from the noncompliance unit, deliver it to the liaison unit and await contact. As before, that contact never came. Tr. at 73:2–25. *See* Pl.Ex. 69.

24. Mr. Bradley's complaints to the noncompliance unit in Albany did not resolve the issue. Tr. at 77:16–20; 78:1–9. *See* Pl.Ex. 70. Mr. Bradley did not seek another fair hearing in 1996 or 1997 because DASIS employees told him that it was unnecessary and useless to seek a new fair hearing merely to enforce the original decision. Tr. at 78:24–79:21.

25. In 1996, DASIS approved rental assistance for an apartment for Mr. Bradley but failed to make payments after he moved into the apartment. Tr. at 85:12–24. As a result, Mr. Bradley was forced to pay the rent out of his social security payments, and to get by otherwise with almost no income. Tr. at 88:3–19. Finally in April 1998, Mr. Bradley received notice from DASIS that they would comply with the 1996 fair hearing order and repay part of the back rent that had accrued. Tr. at 89:13–20. Defendants were compelled to reimburse Mr. Bradley $7,132.00 in public assistance benefits that defendants wrongfully withheld during the period from July 1, 1995 to April 12, 1998, almost three years of welfare benefits. Tr. at 121–22. However, DASIS did not repay over four thousand dollars in rent that Mr. Bradley paid out of his SSI payments.[3] Tr. at 89:13–20, 121:8–122:6. *See* Pl. Exs. 73, 51, 38.

26. The same April 1998 letter from the noncompliance unit stated that Mr. Bradley would receive the food stamps due from August 1996 until March 1998. During this time without food stamps, Mr. Bradley was forced to go from church to church in search of food. However, even after April 1998, Mr. Bradley did not receive his food stamps consistently. Tr. at 89:25–90:19. *See* Pl.Ex. 73.

27. In 1998, Mr. Bradley's DASIS case was closed yet again and he was transferred to regular public assistance. Tr. at 91:9–20. He did not know that his new

3. At trial, City defendants produced a witness who said Mr. Bradley's rental benefits were not paid because his landlady was on public assistance and already received the full rental value of the apartment from the City in a separate public assistance case. Tr. at 794:3–23. HRA was responsible for paying the landlady her benefits. Mr. Bradley's DASIS case manager visited the apartment and approved rental payments to the landlady, and DASIS was aware of the landlady's name as set forth on the application Mr. Bradley submitted to DASIS. Tr. at 184:2–13. However, at no time while Mr. Bradley resided at that address did DASIS ever inform him of the problem. Tr. at 184:14–21. Throughout the relevant period, DASIS failed to pay Mr. Bradley's rent as a result DASIS' wrongful closure of his case. Indeed, in 1998, DASIS paid thousands of dollars in back rent to Mr. Bradley's landlady. Tr. at 85:16–86:5. Only when Mr. Bradley sought compensation for his own expenditures during this two-year period did DASIS provide this excuse.

case manager, Ms. Davis, was not a DASIS employee until he called her. When he responded in person to a letter setting an appointment with Ms. Davis, she told him through a phone bank that she never sent the notice and that she did not handle DASIS clients. Tr. at 92:24–93:24, 100:3–10, 101:15–24. *See* Pl. Exs. 71, 72.

28. Before Mr. Bradley was allowed back to DASIS, he received another letter from a Mark Limerick of DASIS stating that, in order to become a client, he had to resubmit documents he had already submitted to DASIS. Mr. Limerick arranged to meet Mr. Bradley at his home to get the paperwork but failed to show up for the appointment. Mr. Bradley then went to DASIS' office in person and resubmitted the documents. Tr. at 96:24–97:24. Although Mr. Limerick told Mr. Bradley that the transfer back to DASIS would take a week, Mr. Bradley was not transferred back for three to four weeks. 99:1–3. *See* Pl.Ex. 56.

29. In 1998, DASIS sent Mr. Bradley notice of an award of food stamps for the month of September only. Tr. at 104:10–12. The same day, Mr. Bradley received a letter stating that DASIS intended to terminate his public assistance on September 11, 1998, and to reduce his food stamps to only ten dollars per month. Tr. at 105:17–106:16. No one at DASIS could explain to Mr. Bradley why the notices were sent. Tr. at 107:7–10. *See* Pl. Exs. 64, 62.

30. In response, Mr. Bradley requested a fair hearing. On September 8, 1998, the hearing officer reversed DASIS' computation of benefits and directed DASIS to restore lost public assistance and food stamp benefits retroactive to August 1996. Tr. at 110:9–23. Despite the fair hearing decision, DASIS did not restore the lost housing benefits, and has not paid for the lost benefits since then. Nor did DASIS pay a nutrition and transportation allowance following this decision. Tr. at 114:11–20. *See* Pl.Ex. 67 at 5.

31. Mr. Bradley then received a notice informing him that DASIS intended to close his public assistance case yet again on September 15, 1998, for reason "21–5." Tr. at 111:9–14, 111:21–112:6. No one at DASIS could explain what the numerical notation meant. Tr. at 112:13–113:14. *See* Pl.Ex. 66.

32. Mr. Bradley first sought to gain compliance with the 1998 fair hearing decision by following instructions to contact the noncompliance unit and take their printouts to the liaison office, where he was told that he would be contacted. Mr. Bradley was never contacted. Tr. at 114:9–115:9. After he contacted the State compliance unit, a director at that unit told him that he would be contacted when compliance was achieved. Mr. Bradley was never again contacted about compliance with the fair hearing, and the retroactive benefits were never paid. Tr. at 117:18–118:6. *See* Pl.Ex. 74.

33. DASIS' own records noted that in May 1998 Mr. Bradley's case was open and "in fine shape," but then closed as of October 1998. This notation added that sufficient income to meet needs should not have caused the closure, since Mr. Bradley's income had not changed. The discrepancy was not explained. Tr. at 119:8–120:5, 120:9–21. *See* Pl.Ex. 45.

34. In 1999, Mr. Bradley brought in a lease with a request for moving expenses, and a supervisor at DASIS accompanied him to view the apartment. However, a few weeks later, in May 1999, Mr. Bradley's case was closed without notice for a fifth time. Tr. at 125:9–23. Again Mr. Bradley sought conferences that were refused. Tr. at 126:3–127:23. *See* Pl.Ex. 143.

35. Mr. Bradley had informed DASIS of his new address and had received correspondence from DASIS at the new apartment. Tr. at 130:2–12. In fact, DASIS had approved the apartment and was paying the rent for the apartment directly to the new address. Nonetheless, in August 1999, DASIS erroneously mailed a letter to Mr. Bradley's prior address scheduling a

face-to-face appointment for September 1, 1999. Tr. at 131:1–9. Mr. Bradley only learned of the appointment in a phone call with DASIS when he learned that his case had been closed for failure to attend the appointment. 131:14–132:17. *See* Pl.Ex. 141.

36. In November 1999, Mr. Bradley reached an agreement with DASIS to retire alleged utility arrears from the apartment that DASIS had required him to move out of in 1994. Mr. Bradley followed the required steps and secured DASIS' agreement and approval to pay the arrears in November 1999. DASIS failed to pay the arrears, however, and Mr. Bradley's utilities were terminated suddenly and without notice in January 2000. The electricity cut-off spoiled the refrigeration of his medicines and liquid supplements. Tr. at 133:9–134:4.

37. This year (2000), Mr. Bradley was again forced to seek a fair hearing when DASIS issued a notice of intent to reduce his benefits by recoupment of half of the money being paid in rent. Mr Bradley prevailed again; the order reversed the recoupment and directed DASIS to continue benefits. Tr. at 139:1–140:23. *See* Pl. Ex. 138.

38. On March 3, 2000, DASIS again erroneously mailed a letter to Mr. Bradley's old address requiring Mr. Bradley to report for recertification. DASIS had mailed the envelope to his old Manhattan address, yet the notice inside listed his correct new address in Brooklyn. Mr. Bradley only learned of this letter after he contacted DASIS in late March, 2000. Tr. at 141:7–12, 142:14–143:22. Despite knowing Mr. Bradley's correct address, despite paying rent on the current address, and despite the fact that Mr. Bradley corrected this same mistake in 1999, this was the second time DASIS mailed a notice critical to Mr. Bradley's continued receipt of benefits to the wrong address. *See supra,* ¶ 35. Mr. Bradley's case was closed as a result

of the mistake and yet again had to be reopened. Ptf. Mem at ¶ 39. *See* Pl.Ex. 136.

39. In sum, because DASIS' failed to properly assist Mr. Bradley, he was deprived of critical subsistence benefits, to which he was fully entitled, for years. As a result of DASIS' unwillingness or inability to correct his case, Mr. Bradley· was repeatedly unable to access his Medicaid benefits, at one point for approximately two years. *See infra* ¶¶ 14–15, 19–20, 21–22. Without Medicaid, he was unable to take his medication, causing his toenails, fingernails, and even his teeth to fall out. *See infra* ¶ 14. DASIS failed to make any rent payments on behalf of Mr. Bradley for almost two years, and DASIS failed to provide Mr. Bradley with any food stamps for almost two years. *See infra* ¶¶ 24, 26. During this time, Mr. Bradley was unfairly compelled to pay nearly three-quarters of his monthly SSI income toward rent, leaving him little money on which to live and forcing him, *inter alia,* to go to soup kitchens merely to survive. *See infra* ¶¶ 20, 25.

40. Mr. Bradley's right to these benefits was unequivocally established in fair hearing proceedings,[4] which DASIS repeatedly chose to ignore. *See infra* ¶¶ 19, 21, 24, 29, 31, 45.

41. DASIS' repeated failures continued virtually to the date of trial. In failing to register the correct address for Mr. Bradley in 1999, DASIS erroneously mailed him a recertification notice at his old address, and then cut off his much-needed public benefits. *See infra* ¶¶ 33, 34. After Mr. Bradley corrected the Agency's error, moreover, DASIS repeated the mistake in 2000, *see infra* ¶¶ 35, 37, although it appears that DASIS had Mr. Bradley's correct address all along; that DASIS was, in fact, simultaneously mailing rent checks to Mr. Bradley's correct address; and that DASIS even entered the correct address on the notice contained in an envelope

4. Indeed, in each instance that DASIS terminated Mr. Bradley's benefits, Mr. · Bradley pursued and obtained a judicial declaration that DASIS' actions were wrongful.

mailed to the incorrect address. *See infra* ¶¶ 35–36, 38. These were subsistence benefits upon which Mr. Bradley depended for his maintenance. Mr. Bradley testified that he was forced "to go to different churches and sit around the street and wait for people to come with bags so that you could get something to eat because I didn't know what I was going to do." Tr. at 57:11–13.

### Owen Pahl–Greene

42. Owen–Pahl Greene is a forty-five year old man who lives with full-blown AIDS. Because of AIDS and the medications he uses, Mr. Greene suffers from a number of secondary symptoms and illnesses, including chronic fatigue, wasting syndrome, cryptoceriotis, problems with his respiratory tract and his skin and skeletal structure, and opportunistic infections and infestations, as well as blurred vision, headaches, diarrhea, constipation, vomiting, and infections on his fingernails and toenails. Tr. at 187:15–188:22. His T-cell count fluctuates and has fallen as low as twenty-two. He uses up to eleven different types of medication for AIDS. Tr. at 188:24–189:7, 189:20–190:5.

43. Mr. Greene applied for benefits through DASIS in October 1997, while homeless, and became a client in November 1997. Tr. at 191:6–13. DASIS did not provide any permanent housing to him at that time, but placed Mr. Greene in the Allerton Hotel, in a room which was vermin- and cockroach-infested, and lacked adequate heat or suitable bedding. Tr. at 194:10–17, 196:22–197:24, 201:11–202–17.

44. Although some of Mr. Greene's medication required refrigeration, the Allerton Hotel did not provide any. When Mr. Greene informed his DASIS case manager about this issue and his concerns that the medicine would spoil, his DASIS case manager instructed him to place it outside the window in the snow. As a result, the medicine froze and was ruined. When Mr. Greene sought to replace his needed medicine, his case manager accused Mr. Greene of deliberately selling the medicine and seeking a replacement. Tr. at 199:5–200:5.

45. The day before Thanksgiving 1997, DASIS failed to renew Mr. Greene's temporary housing. When he returned to the hotel, Mr. Greene was locked out and was not allowed to retrieve his clothing or medication, forcing him to go homeless on the streets without adequate clothing and without medication for three days and nights. Tr. at 198:16–23, 205:5–206:2. When he was unable to reach his case manager the following Monday and no one at the case management level seemed able to help, Mr. Greene went directly to Gregory Caldwell, the Commissioner of DASIS, who promised that Mr. Greene would be admitted to the hotel that evening. Mr. Caldwell also asked for a copy of the notes that Mr. Greene was keeping. Tr. at 208:18–23, 209:20–210:17. Mr. Greene stayed at a Kinko's branch late into the night transcribing the notes and faxing them to Mr. Caldwell. Tr. at 211:24–212:2. The Allerton Hotel then refused admittance to Mr. Greene based on an unstated curfew policy, and again refused him access to his clothes or his medication. Because of the breakdown in communication and service from DASIS, Mr. Greene spent yet another night homeless. Tr. at 213:7–8, 214:20–215:25. *See* Pl. Exs. 118, 117, 116.

46. On New Year's Eve, December 31, 1997, DASIS moved Mr. Greene from the Allerton to the McBurney YMCA. Tr. at 222:17–22. When Mr. Greene arrived, however, no room was immediately available for him. Tr. at 223:21–24. Eventually, he was placed in a room with no heat, a broken window, and no refrigeration. Tr. at 224:19–225:7. Although his DASIS case manager promised to locate appropriate housing the next day, he failed to do so. Tr. at 225:15–23. Although Mr. Greene complained, DASIS failed to move Mr. Greene to habitable living quarters or to fix his room. Tr. at 226:23–227:17. *See* Pl.Ex. 150.

47. Following DASIS' failure to assist him in securing permanent housing, Mr. Greene suffered a breakdown and was hospitalized at St. Vincent's Hospital in January, 1998. Tr. at 240:20–241:22. Mr. Greene undertook a hunger strike while hospitalized to draw attention to DASIS' failure to assist his search for housing. Tr. at 241:8–242:17.

48. Mr. Greene left the hospital after being told by DASIS that housing was available, only to discover after discharge that DASIS did not have any such available housing. Tr. at 244:12–14, 244:25–245:2.

49. DASIS later placed Mr. Greene into a room at the Crown Hotel, in which (i) raw sewage backed up the bathtub and toilet, (ii) vermin infested the facility, (iii) only soiled carpets, beds, and linens were available, and (iv) no refrigeration for his medication was available. Tr. at 247:3–20, 248:2–3. Although he reported the sewage problems to DASIS, no one from DASIS ever visited the hotel or sought to move Mr. Greene elsewhere. Tr. at 248:15–249:7. See Pl.Ex. 119.

50. In November 1998, Mr. Greene discovered that DASIS had closed his case without notice. Mr. Greene requested a fair hearing which he won. Tr. at 252:2–7. The judge ordered DASIS to restore the lost benefits and continue Mr. Greene's case. Tr. at 253:3–18.

51. Before trial, Mr. Greene decided to stop using DASIS' services because he felt that dealing with the agency was detrimental to his health. Mr. Greene today continues to subsist on SSI benefits and private charity. Tr. at 254:15–19.

52. In sum, DASIS' failure to renew his emergency housing placement, in late November and early December 1997, led Mr. Greene to spend three consecutive nights homeless on the streets and in the subways of New York, without proper clothing and without his medication. *See infra* ¶ 44. Furthermore, DASIS placed Mr. Greene in, and failed to move him out of, emergency housing without heat or refrigeration for his medications, and with an open window, for one month in the middle of winter *See infra* ¶ 45. DASIS also placed Mr. Greene in, and failed to move him out of, emergency housing with, among other things, two inches of raw sewage backed up in the bathtub. *See infra* ¶ 49; Tr. at 249:1–2; Pl.Ex. 119.

**Richard Torres**

53. Richard Torres is a forty-six year old man who was diagnosed with AIDS in 1988. Mr. Torres has been a DASIS client since at least 1995. At present, his primary symptoms are fatigue, depression, and anxiety. His most recent T-cell count was 134. Tr. at 302:19–303:16, 304:9–12. Before trial, Mr. Torres stopped using DASIS because of the stress involved in dealing with the agency and his doctor's advice that his viral load and T-cell count were detrimentally affected during his periods of stress while dealing with DASIS. Tr. at 344:19–345:4. *See* Def. Ex. M at ¶ 2.

54. In 1996, Mr. Torres left the apartment in which he was living in Bushwick, Brooklyn, due to water leaks so bad they rendered it uninhabitable. Although he informed his DASIS case manager about the problem, DASIS did not do anything directly about the problem, nor did they assist Mr. Torres in locating or securing a new apartment. Tr. at 305:14–306:7, 306:13–19.

55. Mr. Torres then sought emergency housing from DASIS. On several occasions, DASIS failed to provide Mr. Torres with emergency housing. On such occasions, Mr. Torres' case manager sent him to barracks-style shelters without individual rooms or refrigeration, unsuitable for persons with AIDS. Tr. at 308:14–309:19, 310:13–14,, 312:19–21. At other times, Mr. Torres was forced to stay on the streets despite having sought DASIS' assistance. Tr. at 311: 14–16.

56. Because of the stress of dealing with DASIS and trying to secure emergency housing, Mr. Torres stopped dealing

with DASIS in 1996. He privately located shelter through a VA shelter and then an establishment called Gift of Love, run by nuns for people living with AIDS. Tr. at 311:21–312:14.

57. In December 1997, Mr. Torres independently located permanent housing in Coney Island and asked DASIS for assistance. Although he submitted all required paperwork, DASIS did not act on the lease for over two months and Mr. Torres consequently lost the apartment. Tr. at 312:23–318:3.

58. Again, in January 1998, Mr. Torres sought help from DASIS and completed an application for permanent housing. In February, Mr. Torres brought another Coney Island apartment to DASIS' attention and asked for assistance. DASIS failed to act on the apartment, and Mr. Torres lost that apartment as well. At no time did his case manager or anyone at DASIS tell Mr. Torres that any further paperwork was necessary, that his case was closed, or that the application was incomplete. Tr. at 315:16–318:11.

59. On July 30, 1998, Mr. Torres missed curfew at the Gift of Love and went to the DASIS center in Brooklyn to seek emergency housing. Tr. at 322:10–323:324:7. His case manager referred him to an address in Upper Manhattan; however, no such address existed and he was again forced to be homeless for the night. Tr. at 323:21–325:15, 325:22–23. Another worker at DASIS confirmed in a phone call that the address Mr. Torres sought was in fact the address to which his case manager had referred him. Tr. at 325:25–326:9, 326:14–327:17.

60. In July 1998, Mr. Torres inquired of DASIS as to the status of his application for permanent housing. Although Mr. Torres had applied for permanent housing in January 1998, his case manager stated that he could not locate the application and required Mr. Torres to fill out a new application. After filling out the application, Mr. Torres sought a receipt but was told by the case manager that receipts were

not given. The DASIS Law requires that receipts be furnished. N.Y. City Admin. Code § 21–128(c)(1). No one at DASIS at that time informed Mr. Torres that his application was incomplete or that his case was closed. Tr. at 329:16–331:12; See Pl. Ex. 32, at 3.

61. In August 1998, Mr. Torres found new housing at Casa Betsaida, a residence for people living with AIDS in Williamsburg, Brooklyn. Tr. at 333:14–19. When he contacted DASIS about his application for permanent housing, he was again told that it was lost and was asked to fill out yet another application. Tr. at 334:7–16. In September 1998, Mr. Torres submitted a lease for Casa Betsaida to his new case manager at DASIS, who informed him that the application would take some time. Mr. Torres again asked for a receipt but his case manager at DASIS refused to provide one. Tr. at 337:4–338:7. Even after Mr. Torres told the case manager that he was threatened with eviction, his case manager did not do anything other than say that it would take time. Tr. at 338:18–339:15. When Mr. Torres and his landlord jointly spoke to the case manager, the DASIS case manager again gave the same response. Only then was Mr. Torres told for the first time that he needed to submit additional documents regarding his SSI award. At no time during this period from September 1998 to December 1998 did anyone inform Mr. Torres that his public assistance case was closed. Tr. at 339:20–340:18.

62. In December 1998, Mr. Torres went to see his case manager about the pending application. He discovered from another case manager, Ms. McCray, that his case had been closed for about a year. Tr. at 341:13–20. At no point prior to this had anyone informed him that the case was closed; Mr. Torres had been waiting since January for DASIS to act on his application for permanent housing. Tr. at 342:5–6. He had brought apartments to DASIS' attention in January and Febru-

ary, only to lose them through DASIS' delay. He had reapplied for permanent housing in July because DASIS lost the original application. Mr. Torres had waited months, facing eviction from Casa Betsaida, for DASIS to pay his current rent. All along, his DASIS case manager consistently told Mr. Torres that DASIS was working on the permanent housing application. Suddenly, in December, DASIS told Mr. Torres that he would have to reapply yet again. When Mr. Torres asked why he had not been informed, Ms. McCray stated that the case managers were not properly trained. Tr. at 342:17–25.

63. In April 1999, DASIS had opened his case, following his intervention in the instant case. Nonetheless, Mr. Torres discovered that his case was closed again only when he went to pick up his benefits. When he called to find out about the closure, he was told that he should have received a notice sent to him at his residence. Although he had provided DASIS with his address at Casa Betsaida and had submitted an application to DASIS for the lease there, Mr. Torres never received any such notice. Tr. at 343:21–344:18.

64. Mr. Torres never received the legally required nutrition and transportation supplement from DASIS. Tr. at 352:19–353:2.

65. Throughout, although Mr. Torres alerted DASIS to the deterioration of his apartment that left it uninhabitable, DASIS repeatedly failed to assist him in locating permanent housing, or even emergency housing. *See infra* ¶¶ 54–55. For a year, when Mr. Torres would submit permanent housing applications, DASIS failed to secure the apartments. *See infra* ¶¶ 57–58, 60–62. In fact, DASIS had failed for the entire year, despite Mr. Torres' numerous applications for permanent housing, to inform him that he needed to reapply for public assistance because his case had been closed for over a year. *See infra* ¶ 62. After DASIS finally reopened his

case, DASIS closed his case again without notice. *See infra* ¶ 63.

**Joy Lafontaine**

66. Joy Lafontaine is a twenty-seven year old woman who was diagnosed with HIV in June 1996 and currently lives with AIDS. She suffers from symptoms including chronic diarrhea, weight loss, severe headaches and fainting spells. In April 1998, she was hospitalized for two to three weeks with pneumonia. She initially took a set of medicines, but stopped because they exacerbated her headaches. She is currently receiving Social Security as income. Tr. at 376:19–378:5.

67. Ms. Lafontaine became a DASIS client in January 1999 upon receiving an acceptance letter from the agency. She understood that the agency provided intensive case management to its clients. Ms. Lafontaine called the phone number provided in the acceptance letter and was told that she was assigned to the Kingsbridge Center in the Bronx, and was told that the name of her case manager was Ms. Isabell. Tr. at 378:22–380:14. *See* Pl.Ex. 155.

68. In March 1999, Ms. Isabell called Ms. Lafontaine at her new residence on West 111th Street in Manhattan and asked her to come in for an appointment and to bring documents regarding her current housing situation. Ms. Lafontaine did so, but did not receive any receipt for this. Tr. at 380:18–381:13. The case manager said that she could not do anything because of a pending fair hearing case regarding the termination of benefits before she became a DASIS client. Ms. Lafontaine informed Ms. Isabell that she had moved to the new address because she lost her electricity. Tr. at 381:16–382:11. Ms. Isabell did not explain any of DASIS' services or its nutrition and transportation supplement to Ms. Lafontaine. Tr. at 384:7–14. DASIS never told Ms. Lafontaine that she could apply for a grant to clear up the utility arrears created by the termination. Tr. at 384:22–385:15.

69. At this time in March, 1999, Ms. Lafontaine was living in her aunt's apartment with seven other people in only three bedrooms. She explained this situation to Ms. Isabell, who did not offer any assistance in locating other housing, but instructed Ms. Lafontaine to bring in the paperwork for any apartment she might find.[5] Tr. at 385:16–386:1.

70. In August, 1999, Ms. Lafontaine received a second acceptance letter from DASIS that was sent to her old address, and then forwarded to her aunt's address. The only difference between this letter and the one received in January was the date on the letter. No one at DASIS explained to her why DASIS sent two acceptance letters, or why the second letter was sent to her old address. Tr. at 387:5–388:3, Pl.Ex. 159.

71. In September 1999, Ms. Lafontaine located an apartment and brought the paperwork to Ms. Isabell. No receipt was given for the paperwork. Ms. Isabell had not assisted in finding the apartment, and two weeks after the papers were submitted, she called Ms. Lafontaine to tell her that the apartment was gone. Since then, Ms. Isabell has not assisted Ms. Lafontaine in looking for housing. Tr. at 388:11–389:17.

72. On November 16, 1999, Ms. Lafontaine received the nutritional and transportation supplements that she was entitled to upon acceptance to DASIS. However, DASIS did not explain the meaning of the grant; Ms. Lafontaine, who works as a peer counselor, learned about the supplement from her coworkers. Tr. at 389:20–390:11. Similarly, no one ever explained the letter she received on October 6, 1999, that purported to reduce her public assistance from $308.50 to $165. Tr. at 390:23–391:16. As a result of this reduction, Ms. Lafontaine went without Food Stamps for October and part of November. However, the change in Ms. Lafontaine's grant was never explained. Tr. at 392:2–14.

73. In sum, Joy Lafontaine testified to numerous instances where DASIS failed to provide intensive case management. Although she was accepted as a client in January 1999, and although she provided her DASIS case manager with documents and her new address when requested in March 1999, DASIS failed to pursue her public benefits case, mailed another acceptance letter to her old address five months later, and did not begin delivering benefits until November 1999. *See infra* ¶¶ 67–68, 70, 72. Her case manager never explained to her what benefits and services, such as nutrition and transportation supplements, might be available; never assisted her with a permanent housing application that Ms. Lafontaine procured individually; and never provided Ms. Lafontaine with receipts for her benefit and service requests. *See infra* ¶¶ 68, 71.

### Service Providers' Testimony Concerning DASIS

74. Plaintiffs presented the testimony of Cynthia Knox and Catherine Bowman, two representatives of service-providing agencies for people with AIDS. These witnesses interact daily with many DASIS-eligible people in the course of their regular work.

75. Cynthia Knox is the Director of the Legal Advocacy Program of Bronx AIDS Services. Tr. at 479:14–16. Bronx AIDS Services is the largest non-medical based provider offering HIV/AIDS services in the Bronx. Tr. at 479:22–23. Ms. Knox estimates that 85% of Bronx AIDS Services' clients are also clients of DASIS. Tr. at 480:20.

76. Ms. Knox is involved on a daily basis in assisting her clients accessing ben-

---

5. Although the date is unclear, apparently at one point Ms. Isabell did inquire if Ms. Lafontaine wanted "scatter site" housing, which is supervised housing requiring the tenant to release control to caretakers and to maintain constant contact with those persons. Tr. at 400:15–401:7. Because Ms. Lafontaine is capable of independent living, she did not need or want such housing. Id.

efits and services from DASIS. Tr. at 480:25–481:4.

77. Ms. Knox has experienced "[e]xtensive problems in working with clients trying to access benefits and services through DASIS." Tr. at 484:22–485:4. She testified that (i) there are problems reaching case workers, (ii) her clients' public assistance cases have been improperly terminated without notice or adequate notice, and (iii) she had experience significant problems with regard to relocating clients, including having clients lose apartments or face eviction because of DASIS' failure timely to assist the clients. Tr. at 485:13–15, 485:20–486:2, 486:7–9.

78. Ms. Knox testified that she has daily problems reaching case managers that include calling but the case manager's phone is off the hook, not having her calls returned or not receiving a response to written correspondence or waiting several hours at a DASIS office to speak to someone concerning one of her clients. Tr. at 490:2–8, 490:11–18, 491:12–14, 492:9–14, 510:9–17.

79. Ms. Knox has been "told by case workers that they carry too many cases and are not able to do the work required of them to provide the services to clients." Tr. at 512:6–8.

80. Ms. Knox testified that on a daily basis DASIS case managers fail to make required home and hospital visits to her clients, sometimes for more than a year. As a result, desperately ill clients are not able to access benefits or end up on the brink of eviction. Tr. at 492:20–493:23, 494:21–495:3.

81. Ms. Knox also testified that DASIS case managers rarely fulfill their responsibility to assist clients in securing apartments and, in fact "it's the exception rather than rule" when they do—an exceptional case manager may fulfill responsibility. More often than not, and on a daily basis, DASIS case managers do not assist clients. Tr. at 496:11–497:2.

82. The failure to fulfill their responsibility to assist clients in finding permanent housing means that her "clients are faced with eviction and have no place to go." Tr. at 497:3–14.

83. Ms. Knox also testified that DASIS case managers, who are also supposed to assist with exceptions to policy, routinely do not provide such assistance. If the exceptions to policy are not processed, it may force clients to the brink of eviction or it could prevent clients from relocating or getting a new apartment. Tr. at 498:12–20, 499:10–18, 499:21–500:6.

84. Ms. Knox testified that though case managers have responsibility to provide receipts that state date application submitted and what papers are still required to complete an application, "[i]n [her] experience [she has] not had a single client who received a receipt from DASIS with regard to an application." Tr. at 501:6–16; 501:21–502:1.

85. Ms. Knox further testified that she has experienced significant ongoing problems with DASIS budgeting a client's case improperly. The consequence of the improper budgeting is that "the client doesn't get the money entitled to to [sic] buy food, buy necessities of daily living, toilet paper and soap. Shelter can become a problem . . . clients are [left] trying to rely on charity of friends. . . ." Tr. at 503:25–504:5, 505:9–18.

86. As part of intensive case management, DASIS case managers have responsibility to make sure clients' cases are not closed. "For example, if papers are needed for recertification . . . and client can't come in, it is the responsibility [of the DASIS case manager] to go to the home or hospital and obtain the documentation necessary to recertify." Tr. at 506:2–14. However, in Ms. Knox's experience there have been many times where her clients' cases are closed without notice. Tr. at 506:24–507:1.

87. Ms. Knox also testified that, in her experience, there are many instances

where DASIS fails to comply with fair hearing decision, sometimes for more than a year. Tr. at 509:20–24.

88. Ms. Knox testified that she "had many, many cases where clients' cases had been terminated and they [the clients] had not been given notice." Tr. at 515:4–6.

89. Ms. Knox also testified that despite DASIS' responsibility to provide intensive case management, her "clients rarely get intensive case management from DASIS." Tr. at 489:17–18. Her trial testimony echoed her deposition testimony that her "experience is that the majority of [her] clients do not receive the benefits of the intensive case management services to which they are entitled." Tr. at 520:11–13.

90. Catherine Bowman is the Deputy Director of the HIV Project at Brooklyn Legal Services Corporation B. Tr. at 529:16–17. Ms. Bowman "was a case manager at DAS from August of 1989 through August of 1990." Tr. at 531:7–8.

91. Ms. Bowman has a current case load of approximately 30 clients, of which approximately 90% are also DASIS clients, and she deals with client issues relating to DASIS on a daily basis. Tr. at 533:11–18; 534:2–5.

92. Ms. Bowman testified that her "clients are generally there to see [her] because they are having problems accessing their benefits. So [she is] regularly seeing people who are experiencing a great deal of difficulty in getting the benefits to which they are entitled." Tr. at 537:25–538:3.

93. Ms. Bowman described a "wide variety of problems. Some of those relate to what is the failure of DASIS to provide intensive case management for people, which is required under The DASIS Law. There are also problems with people getting the precise benefits that they are entitled to. We see a lot of people who are getting the wrong amount of cash benefits, the wrong amount of food stamps; people who are living in inappropriate housing;

people who are having difficulties accessing all sorts of services." Tr. at 538:7–15.

94. Ms. Bowman testified that she has seen cases in the last year where clients requiring home or hospital visits from DASIS did not receive those visits. In some cases, the result of the failure to make those home visits meant that her clients failed to recertify and their public assistance cases were closed. Tr. at 541:11–19; 542:2–8.

95. Ms. Bowman testified that the failure of DASIS to assist clients in locating and securing permanent housing is a "very big problem," and is a daily problem. In any given time in their office they will have 40 people in need of permanent housing. Tr. at 548:2–13. Tellingly, Ms. Bowman, who has worked on many cases testified that she has "actually never seen a DASIS caseworker help someone find a permanent residence." Tr. at 548:14–15.

96. Ms. Bowman described the consequences of DASIS' failure: "[W]e do have a few people who get evicted, despite the fact that we're trying to represent them. So, those people end up in SROs. More often, though, what this does is, it puts a burden on other agencies, ours included, and a lot of other community-based organizations that are providing case management for clients. And, in fact, this is such a pervasive problem for us that we have designed a booklet to give to clients, that has the names and phone numbers of all the community-based organizations that provide these services. And we actually also have realtor lists that we give out to clients. . . ." Tr. at 548:20–549:11.

97. Ms. Bowman testified that in all her experience working with DASIS clients, she has never seen a receipt. Tr. at 550:23.

98. Ms. Bowman also testified that 80% of her benefits cases have problems with DASIS not properly budgeting their cases. Tr. at 553:2–9.

99. Ms. Bowman further testified about the problem of having clients' public assis-

tance cases closed, including that when a client's case is closed, "they don't have any money...." Tr. at 555:24–556:5. Moreover, Ms. Bowman estimated that, "in about thirty percent of the cases that I see, the clients have no idea why their case was closed." Tr. at 555:22–23.

100. Additionally, once a public assistance case is closed, it can be difficult to reopen. "[I]t can be very easy or incredibly difficult, depending on the situation. Sometimes you can call a caseworker, and the case does get reopened quickly. And sometimes, you know, you can call fifty people and try to get it reopened, and no one can tell you why it was closed. And, you know, it's very difficult to get cases reopened, and sometimes we have to go to a fair hearing to have them reopened." Tr. at 556:6–17.

101. However, even winning a fair hearing for her clients does not necessarily get her clients' cases reopened. With respect to the City's compliance with fair hearing decisions, Ms. Bowman testified: "[W]e have a lot of difficulty with compliance. I would say in about seventy-five percent of the cases that we win fair hearings, that we have to struggle to get compliance." Tr. at 557:20–558:1.

102. Ms. Bowman explained to the Court her experience with defendants failure to comply:

> THE COURT: So, if a judge says, open the case, reopen the case, and give the client $100 a month, have you had trouble enforcing decisions such as that?
>
> WITNESS: Yes
>
> THE COURT: How many times, what percentage of the time?
>
> WITNESS: Well, I would say we see it—getting the cases reopened, but getting things adequately budgeted, I would say about half[6] the time it takes a lot of effort on our part to follow up and make sure that the budgeting is done properly.

THE COURT: Notwithstanding this court order?

WITNESS: Yes

Tr. at 558:2–14.

103. Mr. John Maher, the deputy director of field operations for DASIS, claimed to have reviewed the case files of the plaintiffs who testified. Although he claimed to see "some" receipts in those files, he admitted that there were not always receipts. Tr. at 838:21–22.

104. The closure of the service aspects of a DASIS case are not reviewed by the State defendant by fair hearings or otherwise. Tr. at 751:5–9.

105. Furthermore, Mr. Maher admitted that when DASIS disagrees with a fair hearing decision, it will reduce or close a case again and force the client to seek another fair hearing. Tr. at 759:24–760:6, 761:15–762:8.

106. In summary, Cynthia Knox and Cathy Bowman provide advocacy on behalf of DASIS clients at two of the city's largest community-based providers of advocacy and services to persons living with AIDS. Ms. Knox and Ms. Bowman provided testimony, through their extensive, daily experiences with DASIS, that the problems experienced by the individual class members are part of a systemic and widespread problem at DASIS. Ms. Knox testified that she has experienced "[e]xtensive problems in working with clients trying to access benefits and services through DASIS," tr. at 484:22–485:3, an observation echoed by Ms. Bowman. Tr. at 538:1–3 ("So I'm regularly seeing people who are experiencing a great deal of difficulty in getting the benefits to which they are entitled.") Both witnesses provided specific examples of the sorts of recurrent problems that DASIS clients face as a result of DASIS' failure to provide the assistance, and the reasonable modifications, that DASIS is supposed to provide: improper ter-

---

6. Due to an error in the transcript, "half" is written as "have" in the official record. For purposes of readability, the Court has corrected the error in the text of the opinion.

mination of cases without adequate notice, failure to timely process requests for assistance, and lack of intensive case management. *See infra* ¶¶ 87–88, 99–100, 77, 78–80, 89, 92–93. Both testified that DASIS case managers fail to make home visits, in some cases for an entire year, with tragic consequences. *See infra* ¶¶ 80, 94. Both testified that DASIS case managers rarely assist clients to obtain permanent housing. *See infra* ¶¶ 81, 95–96.[7] Both noted significant ongoing problems with misbudgeting a client's needs, depriving the client of the ability to buy the necessities of life, including food, toilet paper, and soap. *See infra* ¶¶ 85, 98. DASIS case managers "carry too many cases and are not able to do the work required of them to provide the services to clients," tr. at 512, and are unresponsive and out of reach. *See infra* ¶¶ 78–79. Even when a client obtains a fair hearing ordering DASIS to reopen a client's case and restore ongoing benefits, both testified that ensuring compliance was a struggle in up to seventy-five percent of cases. *See infra* ¶¶ 87, 100–102. Defendants, in fact, admitted in open court that such determinations were frequently flaunted. Mr. John Maher, DASIS' deputy director of field operations, admitted that even where a DASIS client wins a fair hearing concluding that DASIS wrongfully reduced or terminated the client's benefits, if "we believe we did the right thing, we take the action again." *See infra* ¶ 105.

### Statistical Evidence of Systemic Problems With DASIS

107. At trial, plaintiffs presented an expert witness, Dr. Ernest Drucker, to address the statistical basis for plaintiffs' claims that DASIS experienced broad-based, systemic failure in achieving its mandate. Dr. Ernest Drucker is a professor of epidemiology and social medicine at Montefiore Medical Center who specializes in examining AIDS and its effects on the

New York City population. He regularly uses and teaches about statistics in medical school. His curriculum vitae lists extensive publications regarding HIV and AIDS, as well as public health issues about homelessness and drug use. He has served on a number of advisory boards of HIV service organizations and he works for the Mayor's Office on AIDS Policy. Epidemiology is the field of medicine and public health that studies patterns of disease and populations. The science relies upon statistical analysis to examine differences in population and case incidences of disease. Tr. at 574:16–576:4, 580:20–22. *See* Pl.Ex. 9.

108. From September to December 1997, Dr. Drucker conducted a case study of all applicants for housing at one specific housing facility who applied to DASIS for rental approval. Dr. Drucker examined the length of time from the date that a completed application was submitted to DASIS to the date the initial benefits were issued, or the date the application was denied. Out of 37 consecutive applicants, only 31 submitted completed applications, of which 21 were approved. Eight remained pending on the date the study ended, and two were denied. Dr. Drucker measured the applications that were still pending to the date that the study closed; this estimate of the length of the time was therefore a conservative measurement of how long it took for the benefit to be issued. Tr. at 583:2–586:6, 588:6–14. *See* Pl. Exs. 8, at 3–5, 8A.

109. In over 77% of those 31 cases, the City failed to meet its own mandated time frames of 20 business days or approximately 30 calendar days. For those applicants who were not acted upon with the legally mandated time frames, the median length of time was 63 days but the range for applicants was up to 132 calendar days. The considerable delays in the approval of

---

7. All four of the DASIS clients who testified cited DASIS' failure to assist them in locating permanent housing. This includes Mr. Bradley, *see* Tr. at 60; Mr. Greene *see* Tr. at 238– 39, 251; Mr. Torres *see* Tr. at 314, 329–32, 334; and Ms. Lafontaine, *see* Tr. at 385–86, 388–89, 393.

rental assistance shown in this report provide probative evidence of delays that are typical and systemic. Tr. at 586:4–20, 588:21–589:8. *See* Pl.Ex. 8, at 4, 8A.

110. Shortly before trial, the City produced a report that claims to report the average timeliness of DASIS in providing certain benefits and services.[8] This data was a roster dated May 12, 2000, of over 2,500 applications for a certain class of benefits referred to as "Case–by–Case Financial Assistance" (CBCFA) that were received at DASIS' central office from October 1, 1999, to December 31, 1999, and that were in fact approved by the central office. The types of benefits listed include, *inter alia,* new apartment rents, rent increases and ongoing rent requests, rent arrears, clothing allotments, and home establishment. This data listed by client and by DASIS center when the client first requested the benefit, when a completed application was received at central office, when it was approved, when the benefit issued, and what benefit or service was requested. Tr. at 593:10–595:3, 869:15–20, 871:4–9, 871:10–14, 871:15–17. *See* Pl.Ex. 202.

111. When no date is reported for the issuance of a benefit, either no benefit had yet issued as of the date of the report or else DASIS' Control Unit had no record that the benefit was in fact issued. Although City defendants alleged that for some cases no record will ever exist, e.g. because the client has passed away, City defendants submitted no evidence that this was more than a *de minimis* number. Accordingly, given that the run date is over four months after the close of the quarter, this Court finds that relying upon the run date of the report is an adequate substitute for the date the benefit or service is issued for those applications for which nothing is yet reported. Tr. at 880: 9–18.

112. The DASIS Law[9] requires that

> Where no statute, law, regulation or rule provides a time period within which a benefit or service shall be provided to an eligible person who requests such a benefit or service, such benefit or service shall be provided no later than twenty business days following submission of all information or documentation required to determine eligibility.

N.Y. Admin. Code § 21–128(c)(2). In other words, if a person applies for a benefit or service and is determined to be eligible, DASIS must provide the benefit or service within twenty business days from the date the application is complete. Thus, using the City defendants' backup data, it is appropriate to determine timeliness by comparing when the completed application was submitted and when the benefit issued. Although Deputy Commissioner Caldwell stated he would use the "Approval" date for this purpose, the municipal law is clear. Furthermore, the testimony of Lloyd Kass, DASIS' Director of Quality Assurance, indicates that "Date In" is the last measuring date that could be used, since the operative legal date is the date the completed application was submitted, not when it is subsequently approved, and since all applications in question were in fact approved and thus eligible. More importantly, the date of the submission of the completed application is appropriately used because at that point the applicant has no more control over the processing and issuance of the benefit, and the onus rests with DASIS to perform in a timely manner. Tr. at 869:12–870:14. *See* Pl.Ex. 32.

113. To circumvent the vagaries in computing business days, and because twenty business days will include eight

8. On the eve of trial, City defendants for the first time produced a report that claims to report the average timeliness of DASIS in providing certain benefits and services. The backup data kept by City defendants was not available at the time of Dr. Drucker's study but was produced to plaintiffs only after trial actually began in this matter.

9. also referred to herein as Local Law 49

weekend days, the Court finds that thirty calendar days is a legitimate—and conservative—measurement for the twenty business day rule.

114. A manually tabulated summary of the data provided by City defendants revealed that throughout all of New York City, for all of the benefits and services tracked in the database, 32.9% of all eligible requests were not issued within thirty calendar days. In other words, approximately one-third of all benefits took more than thirty days to issue. As such, and by admission, DASIS is not complying with its own mandates and is violating the DASIS Law. Tr. at 598:9–13, 700:22–701:3, 701:17–702:15. See Pl. Exs. 202 and 203 at Col. 5.

115. Even more egregious, the Amsterdam, Kingsbridge and IHSU Waverly centers all failed timely to deliver benefits 44.6%, 45.4% and 46.9% of the time, respectively. The summary of timeliness of delivery of benefits for all applications at the various centers is set forth below:

Summary of CBCFA Data Provided By DASIS

Data Run Dated Friday, May 12, 2000

"Benefit Issued—Reporting Dates 10/1/99 To 12/31/99"

| Center | Total Applications | Calendar Days * | | Percentage >30 Days | Range >30 Days |
|---|---|---|---|---|---|
| | | ≤30 Days | >30 Days | | |
| Amsterdam | 148 | 82 | 66 | 44.6% | 31–212 |
| Bergen | 294 | 232 | 62 | 21.1% | 31–205 |
| Brownsville | 483 | 303 | 180 | 37.3% | 31–221 |
| Greenwood | 349 | 226 | 123 | 35.2% | 31–221 |
| IHSU (Waverly) | 256 | 136 | 120 | 46.9% | 31–217 |
| Kingsbridge | 355 | 194 | 161 | 45.4% | 31–224 |
| Queensboro | 261 | 209 | 52 | 19.9% | 31–224 |
| St. Nicholas | 233 | 180 | 53 | 22.7% | 31–205 |
| Staten Island | 67 | 61 | 6 | 9.0% | 33–45 |
| Waverly | 122 | 100 | 22 | 18.0% | 36–211 |
| Total | 2568 | 1723 | 845 | 32.9% | 31–224 |

* Measures number of calendar days between dates reported in columns labeled "date in" and "benefit issued." In cases where no benefit had yet issued, used date of report.

Tr. at 596:14–20, 598:6–9. See Pl. Exs. 202 and 203, at 1.

116. The range of time in which benefits are issued may extend far beyond the thirty-day time frame into the hundreds of days. For example, many eligible clients who submitted requests for benefits in late November or early December did not receive their benefits until April 2000, and some still had not received any benefit as of May 12, 2000. The range of timeframes for the delivery of these benefits and services ranged from 31 days to over 200 days. See, e.g., Tr. at 884:14–886:4. See Pl. Exs. 202 at 13, 69; Pl.Ex. 203, at Col. 6.

117. An examination of requests for new apartment applications during the October–December, 1999 time period corroborates the sample study performed by Dr. Drucker in 1997–98. For example, at the Amsterdam center eighteen of forty applications took more than thirty days to complete; i.e., 45% of new apartment benefits were not timely delivered after an eligible application was delivered to DASIS' central office. Overall, new apartment benefits and services were not timely delivered 32.1% of the time. Tr. at 599:19–600:10; Pl.Ex. 203, at 2.

118. Furthermore, these figures likely understates the problem. Rather than measure timeliness from the submission of the completed application to the client's case manager, DASIS measures timeliness from the date that DASIS' Central Unit receives the completed application. *Cf.* N.Y.City Admin. Code § 21–128(c)(2)(requiring issuance of benefit or service within 20 business days of *submission* of completed eligible application). Hence, the actual length of time between submission and issuance is likely greater than reported. Tr. at 599:19–600:16; 618:24–619:16; 886:14–887:11.

119. The same data used to generate these summaries is the basis of a portion of a Quarterly Performance Report ("QPR") that City defendants produce pursuant to the DASIS Law. That portion reports on the average numbers of days it takes for a benefit to be issued. By taking an average, that report minimizes the number of failures to timely deliver benefits, "diluting" them with those cases in which DASIS meets is legal obligations. For example, where an average for providing a specific type of benefit at one center is 27 days, that figure masks the number of applications whose benefits are not issued for over twenty business days. Tr. at 873:8–874:1. *See* Pl.Ex. 5C at 16.

120. The database used for both the QPR and for the summaries referenced above includes applications for emergency requests for CBCFA benefits and services, which defendants are required to in the significantly shorter time period of 72 hours. *See infra,* ¶ 185. Thus, using 30 days as the time frame defendants further masks defendants' negligence in cases where defendants may have exceeded the legally mandated time frame of only 72 hours. Tr. at 875:20–876:14.

121. The Quarterly Report issued by DASIS demonstrates that even using the mean number, benefits are frequently delivered in an untimely manner. For example, DASIS' own report reveals that on average, from submission of the completed application to issue the benefit or service, the Brownsville center takes 44.1 days for ongoing rent, and 60.7 days for rent increase requests. The Greenwood center takes 67.6 days for home establishment requests, 59.8 days for voluntary departure requests, and 41.1 days for clothing allotment requests. The IHSU Waverly center takes over 79 days for client share rent arrears requests. The Kingsbridge center takes 35.8 days for ongoing rent requests, and 71 days for voluntary departure requests. *See* Pl.Ex. 5C at 17, table 1, line 3 (last two columns); at 18, table 1, line 3 (last two columns); at 19, table 1, line 4 (last two columns); at 20, table 1, line 4 (last two columns); at 21, table 1, line 4 (last two columns); at 22, table 1, line 5 (last two columns); at 17, table 1, line 6 (last two columns); at 20, table 1, line 6 (last two columns).

122. Additionally, the QPR only reports averages for benefits that have issued and does not include in the average those applications for which a benefit has not yet issued. Tr. at 886: 5–10.

123. The Quarterly Report also only measures the average timeliness for eligible applications that are in fact approved. No data is reported regarding the timeliness of DASIS in rejecting applications. *See generally* Pl.Ex. 5C at 16—25.

124. Other than the QPR, City defendants do not report timeliness data that shows the length of time from when an application is made to when the benefit is issued.[10] Tr. at 708:2–15.

---

**10.** The Court notes that DASIS does apparently publish monthly reports that report on the number of requests made for emergency housing made and the number of placements made. However, no report was submitted into evidence and City defendants at trial admitted that DASIS does not track the length of time, only the quantity of requests, referrals and placements—which is significantly different from reporting timeliness. Tr. at 708:2–15.

125. City defendants admitted at trial that no audits or other system of verification exists with regard to this timeliness data. Tr. at 877:6–878:18.

126. The Court finds the foregoing facts credibly demonstrate systemic problems in DASIS' efficient and timely administration of benefits.

### The DASIS Law

127. At the commencement of this litigation, members of the plaintiff class received publicly subsidized benefits through the Human Resources Administration's ("HRA") Division of AIDS Services ("DAS") and it Income Support /AIDS Services Program. Presumably in an attempt to expedite access to essential social services, DAS was restructured from 1995–1997. The case management system was eliminated. DAS and IS/AS were consolidated into the Division of AIDS Services and Income Support ("DASIS"), the department that currently facilitates the provision of public benefits and services to the plaintiff class. However, these changes did not operate to increase DASIS' efficacy and the New York City Council reviewed the issue in 1997.

128. Local Law 49, also known as the DASIS Law,[11] was passed by the City of New York in 1997. It mandates the provision of a broad range of benefits and services to people with AIDS or clinical/symptomatic HIV illness. In addition, DASIS was formally established as the organization charged with ensuring persons with clinical/symptomatic HIV meaningful and equal access to public services and benefits. The DASIS Law was structured to codify the existence of DASIS and "provide access to benefits and services to [publicly subsidized benefits and service] to every person with clinical/symptomatic HIV illness … or with AIDS …." N.Y.City Admin. Code § 21–126. In addition to creating certain specific benefits in the form of nutrition and transportation allowances, the DASIS Law also requires DASIS to provide "intensive case management", with low case-manager-to-client ratios and specific timeliness requirements to provide meaningful and equal access to public benefits and services for its clients. Id.; § 21–127 and 21–128(c)(2). See Pl.Ex. 32 at 1, 3.

129. Deputy ·Commissioner Caldwell testified that DASIS was not fully in compliance with the legal requirements of the DASIS Law in either December 1997 or in June 1998, and is not today fully compliant with the DASIS Law. Tr. at 716:1–15, 21–22.

130. Deputy Commissioner Caldwell further admitted that, despite the mandates of the DASIS Law, DASIS does not track the length of time required to process requests for many benefits and services, including those administered by the State;[12] the total number of persons placed in permanent housing; the average length of time to reopen cases closed; or the average length of time required to comply with fair hearing decisions. Tr. at 717:20–718:17, 718:22–719:5, 722:11–723:5, 725:25–726:2, 726:10–13, 729:21–25, 730:5–11.

131. Although DASIS intends to implement automation projects to fully automate its systems, the automation plans that should have been completed by the end of 1999 did not occur. No deadline was presented for when the automation will be complete; DASIS' quarterly report indi-

---

11. Local Law 49 is codified at § 21–126 et seq. of the New York City Administrative Code. The DASIS Law undid much of the restructuring DASIS had undergone in the two years prior to its enactment: it restored a case management system which had been eliminated and established firm, comparatively low case manager-to-client ratios. See N.Y.C. Admin. Code § 21–127.

12. The Court notes that although Deputy Commissioner Caldwell did initially assert that DASIS could track this data with respect to housing, he later admitted that DASIS did not track the length of time from an initial request for supportive housing to submission of the completed application. Tr. at 720:12–721:6.

cates that as of yet, bids have not been accepted for the project. Tr. at 741:25–742:4; Pl.Ex. 5C at 7.

132. Deputy Commissioner Caldwell also admitted that DASIS does not track whether receipts are issued when a benefit or service is requested. Tr. at 747:15–23, 749:5–7.

## CONCLUSIONS OF LAW

### I. Relevant Legal Standards

#### Declaratory Judgment

133. Plaintiffs seek a declaratory judgment as to the rights of the plaintiff class. This Court has the authority to render a declaratory judgment pursuant to 28 U.S.C. § 2201(a), which states in pertinent part:

> In a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and to and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

134. Under established law, a court should issue a declaratory judgment where (1) the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding. See Continental Cas. Co. v. Coastal Savs. Bank, 977 F.2d 734, 737 (2d Cir.1992); Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969). If either prong of this test is met, the action must be entertained. See id. For the reasons stated below, the Court finds that both bases for the test used in

Broadview are implicated in the case at bar and that a declaratory judgment is appropriate under each prong of the test.

### Permanent Injunction

135. The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that plaintiffs must actually succeed on the merits. See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); Civic Association of the Deaf of New York City v. Giuliani, 915 F.Supp. 622, 631 (S.D.N.Y.1996). Accordingly, plaintiffs must show irreparable harm, and they must succeed on the merits. See, e.g., Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir.1990). For the reasons stated below, a permanent injunction will be entered in this case.[13]

136. Defendants contend a permanent injunction should not be entered because plaintiffs relied upon outdated evidence at trial. The Court finds no merit in this argument. Firstly, the vast majority of evidence upon which plaintiffs relied was quite contemporary. This included, for example, City defendants' own most recent quarterly performance data for the period October 1999 through December 1999. The contemporary evidence merely confirmed, moreover, the validity of plaintiffs' older evidence. Furthermore, defendants proffered no evidence or data to suggest that plaintiffs' evidence was somehow outdated or presently invalid.

137. Secondly, both non-expert and expert discovery closed over one year before

---

**13.** This Court denied a preliminary injunction to plaintiffs at the commencement of this litigation, finding the likelihood of success on the merits was low. Furthermore, at the time, there were active political efforts to repair the problems DAS clients faced in accessing the agency. DAS was to undergo restructuring, and later was subject to a new charter in Local Law 49. The Court was optimistic about these developments, and believed the agency showed significant promise in achieving its mandate. However, many years later and faced with evidence that belies those expectations, the Court finds that plaintiffs' success on the merits is clearly warranted and that a permanent injunction is appropriate in this case.

trial.[14] It is the major disadvantage of civil litigation that the freshest and most probative evidence must be shelved through months, and even years, of discovery, before it faces review by the trier of fact and the trier of law. As one appellate court has explained, under analogous circumstances:

> Courts have always preferred to decide issues of public importance on the basis of a concrete and clear-cut record, with fresh evidence of current validity. But the evidence in a case may lose some of that freshness while running a endless gauntlet of litigation, particularly when judicial review follows several layers of administrative determination. This is such a case. In these circumstances, a court may still find that a party has few other opportunities for review, and that the case is presented in such a form that the lapse of time does not impede proper judicial determination of the merits.

*Montgomery Environmental Coalition v. Costle,* 646 F.2d 568, 573 (D.C.Cir.1980); *see also Morel v. Giuliani,* 927 F.Supp. 622, 632 (S.D.N.Y.1995)(noting that injunctive relief available where an issue is "capable of repetition, yet evading review"); *Brown v. Giuliani,* 158 F.R.D. 251, 265 (E.D.N.Y.1994). Such is the case here, particularly considering that plaintiffs' contemporary evidence buttresses plaintiffs' largely uncontested older evidence.

## II. Federal Disability Claims

138. Plaintiffs' central claim in this lawsuit is that defendants have violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (the "ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehab. Act"), and their implementing regulations. The ADA was enacted in 1990 to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101. Title II of the ADA broadly provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehab. Act, enacted 17 years earlier, similarly provides: "No otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a).

139. As remedial statutes, both the ADA and the Rehab. Act must be broadly construed to effectuate their anti-discriminatory purpose. *See, e.g., Niece v. Fitzner,* 941 F.Supp. 1497, 1505 (E.D.Mich.1996) ("It is a familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. This broad construction is also applied to civil rights statutes. Accordingly, a broad construction is given to both the Rehabilitation Act and the ADA.") (citations and internal quotations omitted); *Civic Ass'n of the Deaf v. Giuliani,* 915 F.Supp. 622, 634 (S.D.N.Y.1996).

140. The mandates of the ADA and the Rehab.Act are further elaborated in the implementing regulations promulgated by the Department of Justice ("DOJ") and the Department of Health and Human Services ("HHS"), respectively. These regulations "are entitled to controlling weight unless they are 'arbitrary, capricious or manifestly contrary to the statute.'" *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 45 (2d Cir.1997) (quoting *Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *accord Chevron,* 467 U.S. at 844,

---

14. Trial was then delayed as a result of settlement negotiations that, after several months, proved fruitless. Under such circumstances, it is understandable that some of the evidence will not be up to the minute.

104 S.Ct. 2778 ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."); *Bragdon v. Abbott*, 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) ("The [Rehab.Act] regulations are of particular significance because, at the time, HEW [the original drafter] was the agency responsible for coordinating the implementation and enforcement of § 504.").

141. Although there are subtle differences between these disability acts, "the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." 28 C.F.R. Pt. 35, App. A. In addition, the DOJ regulations provide that Title II "shall not be construed to apply a lesser standard than the standards applied under Title V of the Rehabilitation Act of 1973 (29 U.S.C. § 791) or the regulations issued by Federal agencies pursuant to that title." 28 C.F.R. § 35.103(a). Hence, "[b]ased upon the close relationship between the two acts, cases interpreting the Rehabilitation Act are considered persuasive authority for interpreting the ADA." *Tugg v. Towey*, 864 F.Supp. 1201, 1205 n. 4 (S.D.Fla.1994). *Accord Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir.1999), *pet. for cert. filed.* No. 99–10163 (June 23, 2000). For these reasons, the Court will consider plaintiffs' ADA and Rehab Act claims together.

■ 142. To establish a violation under the ADA, plaintiffs must demonstrate that (1) they are "qualified individual[s] with a disability"; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. *See, e.g., Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir.1998); *Civic Ass'n*, 915 F.Supp. at 634 (S.D.N.Y.1996). To establish a violation

under the Rehab Act, plaintiffs must, in addition, establish that defendants receive federal funding. *See, e.g., Doe*, 148 F.3d at 82. In the instant matter, defendants admit that plaintiffs are qualified individuals with disabilities, that defendants receive federal funding, and that defendants are subject to both the ADA and the Rehab. Act. Defendants deny, however, that plaintiffs have been discriminated against as that concept is defined under the statutes and their implementing regulations.

■ 143. The ADA and the Rehab. Act reflect the fact that discrimination against the disabled is often unintentional, the result of oversight and disregard rather than discriminatory animus. *See, e.g., Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir.1995) ("[T]he ADA attempts to eliminate the effects of... 'benign neglect,' 'apathy,' and 'indifference.'"); H.R.Rep. No. 101–485(II), at 29 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 310 ("Discrimination against people with disabilities results from actions or inactions that discriminate by effect as well as by intent or design."). Accordingly, "[t]he prohibition of Title II applies to action that carries a discriminatory effect, regardless of the [government's] motive or intent." *Tyler v. City of Manhattan*, 857 F.Supp. 800, 817 (D.Kan. 1994); *see, e.g., Helen L.*, 46 F.3d at 335 ("Because the ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the 'invisibility' of the disabled, Congress could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination."); *Bravin v. Mount Sinai Medical Ctr.* 186 F.R.D. 293, 301, vacated in part, 58 F.Supp.2d 269 (S.D.N.Y.1999) ("In the context of the [Rehabilitation Act], intentional discrimination against the disabled does not require personal animosity or ill will.").

144. Consistent with these principles, in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court established that a public entity must do more than merely provide

access to the benefits that it offers. Instead, "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers . . . ." *Id.* at 301, 105 S.Ct. 712 (emphasis added); *accord* ADA Compliance Guide ¶ 804 (Thompson Publ'g Group, Inc., 1990 and Supp. Dec. 1991) (The ADA "stress[es] the concept of equal opportunity, not merely equal treatment, to eliminate discrimination."). "[T]o assure meaningful access," the Supreme Court explained, "reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander,* 469 U.S. at 301, 105 S.Ct. 712; *see Dopico v. Goldschmidt,* 687 F.2d 644, 653 n. 6 (2d Cir.1982) ("[W]here the relief requested did not modify some integral aspect of a defendant's program, courts have ruled that section 504 does require efforts to make the program available to otherwise qualified handicapped persons."). The Supreme Court added that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent." *Alexander,* 469 U.S. at 296–297, 105 S.Ct. 712.

145. The DOJ regulations that implement Title II of the ADA reflect these principles. See H.R.Rep. No. 101–485, pt. 2, at 84 (1990) ("[I]t is . . . the Committee's intent that [Title II of the ADA] also be interpreted consistent with *Alexander v. Choate.*"); Mark C. Weber, Disability Discrimination by State and Local Government: The Relationship Between Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, 36 Wm. and Mary L.Rev. 1089, 1115 (1995) ("In the legislative history of Title II, the

congressional committees held out *Choate* as the definitive interpretation of section 504 that it intended Title II to copy."). Indeed, three separate provisions of the DOJ regulations require public entities to provide disabled individuals with meaningful access to their programs, benefits, and services. First, Section 35.130(b)(1) of the regulations establishes that a public entity may not "provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . ." 28 C.F.R. § 35.130(b)(1)(iii).[15] Second, a public entity may not "utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3)(i), (ii).[16] Third, under Section 35.130(b)(7), "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modification would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

146. Consequently, as the Second Circuit has observed, "[i]t is not enough to open the door for the handicapped . . . ; a ramp must be built so the door can be reached." *Dopico,* 687 F.2d at 652. Plaintiffs in this case contend that DASIS was created to serve as a reasonable accommodation to their disability, a "ramp," as it

---

**15.** The Rehab Act regulations similarly provide that a covered entity may not "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others . . ." 45 C.F.R. § 84.4(b)(1)(iii). Covered entities also "must afford handicapped persons equal opportunity

to obtain the same result, to gain the same benefit, or to reach the same level of achievement . . ." 45 C.F.R. § 84.4(b)(2).

**16.** For the analogous HHS regulation *see* 45 C.F.R. § 84.4(b)(4).

were, to assist them in accessing and maintaining the social welfare benefits and services to which they are entitled. Plaintiffs claim the "ramp" of DASIS is necessary under the ADA and the Rehab. Act to ensure them meaningful access to the benefits and services upon which they depend, and for which they are fully qualified. Without a fully functioning DASIS, plaintiffs argue, defendants cannot provide them with an "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii); defendants cannot "accomplish[ ] the objectives of the public entity's program with respect to individuals with disabilities," 28 C.F.R. § 35.130(b)(3)(ii); and defendants will fail to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

147. This Court previously held that DASIS is a reasonable modification to defendants' policies, practices, and procedures to ensure plaintiffs meaningful access to the benefits and services defendants provide. As this Court has explained:

> Public assistance is generally provided to eligible New Yorkers when they meet their periodic appointment schedules and verify their status in other ways. Frequently, this means waiting in long lines, and if they receive more than one type of benefit, it means doing so at several different locations. Given plaintiffs' disability and, in particular, the ease with which even minor infections can profoundly threaten their health, it is clear that defendants must provide Food Stamps, Home Relief, and other public assistance benefits in some modified fashion to these plaintiffs.

*Henrietta D.*, 1996 U.S. Dist. LEXIS 22373, at \*26. "The goal of DAS[IS]," this Court has ruled, "at least in part, is to facilitate HIV-positive clients who are ill through the complex maze of social services that provide the variety of public assistance benefits to which plaintiffs are entitled." *Id.* Hence, "in its most basic, facilitory [sic] efforts, DAS[IS] is a necessary modification to, and not a fundamental alteration of, the public assistance services that the City provides to all eligible New Yorkers." *Id.* Defendants, in fact, argued this at trial: "DASIS itself is a reasonable modification of the public assistance programs administered by HRA to all non-DASIS clients." Tr. at 647:14–16.[17]

148. In 1997, the New York City Council enacted, and Mayor Giuliani signed, Local Law 49 (the "DASIS Law"). N.Y. City Admin. Code §§ 21–126 et seq. The DASIS Law codified the existence of DASIS, reflecting this Court's ruling in 1996 that DASIS is a necessary modification to the public assistance programs that the City provides to all eligible New Yorkers. *See Henrietta D.*, 1996 U.S. Dist. LEXIS 22373, at \*26. In addition to codifying DASIS' existence, the DASIS Law mandated that defendants provide many of the kinds of modifications that the instant plaintiffs have asserted to be necessary to fulfill defendants' obligations under federal law. For example, the DASIS Law requires: "intensive case management" services, *see* N.Y. City Admin. Code § 21–127; relatively low case manager-to-client ratios, in recognition of the special and complex needs of DASIS clients, *id.*; assistance "at a single location in order to apply for publicly subsidized benefits and services," including assistance at the home or "at a hospital where such applicant or recipient is a patient" (*see id.* § 21–127(a)(1)); and a "reasonable good faith

---

**17.** Defendants provided no evidence that DASIS and its special functions represents a fundamental alteration of defendants' service, program, or activity. The reasonableness of the modifications that plaintiffs seek, more- over, is evidenced by the fact that virtually all are modifications that defendants have long purported—but failed—to provide, and that they are now required by local law to provide.

search for at least a ninety-day period to locate the recipient" before terminating a client's benefits and services. *See id.* § 21–127(f). Finally, the DASIS Law requires City defendants to track and report the timeliness of DASIS in approving clients' requests for, and in providing, all of the benefits and services that DASIS administers. (*See id.* § 21–1270).

149. The DASIS Law provides important evidence of what a legislative body, in its wisdom, has deemed necessary to "ensure the provision of benefits and services to eligible persons...with clinical/symptomatic HIV illness or with AIDS." *Id.* at § 21–126. Thus, although the DASIS Law is not the basis of plaintiffs' claims in this matter, the fact that many, if not all, of the modifications that plaintiffs seek under the disability statutes are now required under local law provides powerful evidence that such modifications are reasonable, and that they certainly would not fundamentally alter the nature of defendants' programs. As this Court has previously held, "plaintiffs are not barred from satisfying their burden of proof on the elements of their federal law claims using definitions, obligations, and responsibilities found in state law. Plaintiffs may use state law ... to prove that [defendants are] in violation of federal law." *Henrietta D. v. Giuliani,* 81 F.Supp.2d 425, 431 (E.D.N.Y.2000).

150. At this time, the Court finds that plaintiffs demonstrated at trial that the ramp that DASIS purports to be is broken, i.e., that defendants are failing to make the reasonable accommodations necessary to ensure plaintiffs meaningful access to, and an equal opportunity to benefit from, the social welfare benefits and services that defendants provide to eligible New York City residents. The extensive evidence proffered at trial—from representative plaintiffs, from some of the City's largest providers of services to the plaintiff class, from expert testimony, and from the City's own performance-tracking reports— establishes unequivocally that defendants are chronically and systematically failing to provide plaintiffs with meaningful access to critical subsistence benefits and services, with devastating consequences.

■ 151. As the Supreme Court has explained, the failure to provide benefits

> may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.

*Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *accord Morel v. Giuliani,* 927 F.Supp. 622, 635 (S.D.N.Y.1995) ("To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."); *Brown v. Giuliani,* 158 F.R.D. 251, 264 (E.D.N.Y.1994) ("loss of even a small portion of welfare benefits can constitute irreparable injury"); *Willis v. Lascaris,* 499 F.Supp. 749, 760 (N.D.N.Y.1980) ("[T]he consequences of those mistakes in the social service arena, are more harmful than if they are made in other government programs because the ability of people to survive maybe jeopardized. In a just society, even a temporary undetermining [*sic* ] of that ability is unacceptable and irreparable."). These problems are magnified for a person living not merely with HIV, but with clinical/symptomatic HIV illness and AIDS, as all of the instant plaintiffs do.[18]

---

**18.** Plaintiffs' expert witness, Dr. Tanya Zangaglia, testified that, owing to the danger of developing resistant strains of HIV, "[i]t is absolutely imperative that people, once they commit to the relationship with their medication, they must continue that relationship over time ...." Tr. at 443. Dr. Zangaglia also testified that poverty and limited mobility can make it extremely difficult for persons living with AIDS to maintain their critical dietary restrictions, Tr. at 461; that stress can weaken plaintiffs' already weakened immune system, Tr. at 461; and that "[t]he added stress of lack of housing, food, medical care,

152. The evidence presented demonstrated an alarming failure to provide plaintiffs with the intensive case management and assistance that DASIS was intended to provide. In the unsatisfactory performance of these services, DASIS cannot ensure plaintiffs meaningful access to their subsistence benefits. *See Morel,* 927 F.Supp. at 635 (noting that degree of harm resulting from City's delay in restoring public assistance benefits "is made evident by the fact that most changes in benefits are reversed or withdrawn after a hearing.")

153. The plaintiffs, the community-based representatives, and defendants own data painted a picture of an agency that routinely fails to provide access, meaningful or otherwise, to its clients. DASIS' systemic failure to provide its clients with meaningful access to their benefits and services was also conclusively established through defendants' own quality assurance data. As noted, this data[19] tracks the timeliness of DASIS in providing certain benefits to eligible DASIS clients. The data demonstrates a widespread and highly disturbing inability of DASIS to provide critical benefits within the time frames mandated by law. For the agency overall, data for October–December, 1999 demonstrates that DASIS failed to provide eligible clients with a total of 10 different benefits within the legal time frame 33% of the time. Even more disturbing, in some DASIS centers (notably the Amsterdam, Waverly, and Kingsbridge centers) DASIS failed to do so 45%, 44% and 44.6% of the time. *See* Pl. Exs. 202 and 203, at 1. In practical terms, this means that thousands of indigent New Yorkers living with AIDS stand an almost fifty-fifty chance of having their rights violated by this agency—rights to critical subsistence benefits for which they have been determined fully eligible. It is noteworthy that these figures are

based upon defendants' own data which, according to plaintiffs, may understate the extent of the problem.

154. In *Morel,* City defendants admitted to failing to provide timely aid continuing benefits to the plaintiff class in at least 10% of all eligible cases. *Morel,* 927 F.Supp. at 636. The court concluded, on this basis, that plaintiffs had demonstrated a likelihood of success on the merits of their claim and issued an injunction against the City and State defendants. *Id.* at 637; *accord Alexander v. Hill,* 707 F.2d 780, 784 (4th Cir.1983)("The defendants' objection to the 100% applicability of the relief ordered, based on a claim that it is too Draconian, need not long detain us .... The law itself compels 100% compliance."); *Haskins v. Stanton,* 794 F.2d 1273, 1277 (7th Cir.1986); *Robidoux v. Kitchel,* 876 F.Supp. 575 (D.Vt.1995) (rejecting argument that failure rate of 6.5% to 10% in meeting 30–day limit was acceptable). As the court in *Robidoux* explained:

> [T]he law requires full compliance, absent a minimum of human error. But, even if the law required only substantial compliance, the Court must look to the nature of the interest at stake in determining what is "substantial." Here, the interest lies in the question of entitlement to subsistence-level benefits making the consequences of failure to comply quite serious .... Individuals deemed eligible for benefits need assistance quickly.

*Robidoux,* 876 F.Supp. at 579–80 (citations and internal quotations omitted). Here, plaintiffs have demonstrated a failure to provide timely subsistence benefits to the plaintiff class in at least 33% of all eligible cases, triple the rate on noncompliance in *Morel.* And again, this rate reaches 45%

and other basic survival services and benefits poses a serous threat to [plaintiffs'] health." Tr. at 462. The Court will note that it discredits portions of Dr. Zangaglia's testimony regarding her report, Pl.Ex. 13, finding that

defendants effectively impeached her on those grounds.

**19.** City defendants are required to compile this data pursuant to the DASIS Law.

in some DASIS centers. *See* Pl.Ex. 203 at 1.

155. There are additional examples of this; using defendants' figures, the Waverly DASIS center took an average of 79 days from the date of a completed application for client share rental arrears to the issuance of the benefit. *See* Pl.Ex. 5C at 22. The applicable law requires that such benefits be provided no later than twenty business days following the submission of a completed application in non-emergency situations. *See* N.Y. City Admin. Code §§ 21–128(c)(2). Under State regulations, moreover, in emergency situations, such as when clients face eviction, DASIS must issue the benefits within 72 hours of the submission of a completed application. *See* N.Y. Dept. of Social Services Directives 86 ADM–7; *Hernandez v. Hammons*, 239 A.D.2d 192, 194, 657 N.Y.S.2d 170 (1st Dept.1997) (observing that 86 ADM–7 imposes a 72–hour time frame for determining eligibility and awarding emergency benefits in cases of immediate need, "such as receipt of a notice of eviction or dispossession").

156. DASIS includes emergency cases with non-emergency cases in reporting overall time frames, *see supra*, ¶ 119. Because of this, the overall averages for delivery of all CBCFA benefits, including arrears cases, are artificially reduced, while DASIS' performance in emergency cases remains unreported. Conflating the emergency and non-emergency time frames serves only to mask the extent of DASIS' noncompliance. Furthermore, even evaluating the combined figures, the data establishes an egregious failure to meet the legal time frames with respect to a benefit critical to clients' housing situations; indeed, by any measure, 79 days is more than double the legal time frame.

157. Similarly, DASIS' own figures reveal that the Brownsville DASIS center took an average of 60.7 days from the date of a completed application for a rent increase to the issuance of the benefit. *See* Pl.Ex. 5C at 18. DASIS' figures reveal that the Greenwood DASIS center took an average of 59.8 days from the date of a completed application for a voluntary departure benefit to the issuance of the benefit, and the Kingsbridge DASIS center took an *average* of 71 days to issue this benefit to eligible DASIS clients. *See* Pl. Ex. 5C at 20. The applicable law requires that each of these benefits be provided no later than *twenty business days* following the submission of a completed application. *See* N.Y. City Admin. Code §§ 21–128(c)(2).

158. The QPR also demonstrates that City defendants are failing to provide intensive case management and are in violation of their own mandate with regard to case manager/supervisor-to-client ratios. Pursuant to the DASIS Law, DASIS is required to provide plaintiffs with "intensive case management with an average ratio which shall not exceed one caseworker or supervisor to twenty-five family cases, and with an overall average ratio for all cases which shall not exceed one caseworker or supervisor to thirty-four cases." N.Y. City Admin. Code § 21–127(*i*). The QPR reports that in the Kingsbridge DASIS center, there are total of 4,403 cases and only 96 case managers and supervisors. *See* Pl.Ex. 5C at 10, 28. This represents a case load ratio of 45.9 to 1. Similarly in the Bergen DASIS center, there are a total of 3,519 cases and a total of 79 case managers and supervisors, yielding a case load ratio of 44.5 to 1. *See* Pl.Ex. 5C at 10, 28. Hence, DASIS' own figures establish that in some parts of New York City, city defendants are violating the maximum ratios established by a legislative body "to ensure the provision of benefits and services" to plaintiffs. N.Y.City Admin. Code § 21–126. This evidence supports the testimony of class members and representatives of community-based organizations that DASIS case managers are unresponsive to plaintiffs' needs, unable to provide them the intensive case management they require, and

unable to ensure them meaningful access to their subsistence benefits and services.[20]

159. The evidence that plaintiffs proffered stands in stark contrast to the conspicuous lack of evidence presented by defendants. Although plaintiffs at all times bear the burden of proof, the Court will acknowledge a noticeable lack of counterevidence at the end of five years of litigation. In this time, the only data that defendants have compiled, produced by City defendants literally on the eve of trial, helps to establish their systemic failure to provide plaintiffs with timely access to critical subsistence benefits.[21]

160. Finally, City defendants raised two inaccurate legal arguments that merit brief examination here. First, City defendants suggested that plaintiffs seek additional benefits, or better benefits, than the non-disabled receive, which the law does not compel. *See* Tr. at 646–650. Defendants repeatedly emphasize the nutritional and transportation allowance, which only DASIS clients receive, while ignoring the vast majority of benefits and services that plaintiffs receive which are precisely the same as those received by the non-disabled.[22] This Court has rejected this argument twice, in two separate decisions. *See Henrietta D. v. Giuliani*, 81 F.Supp.2d 425, 432 (E.D.N.Y.2000) ("Plaintiffs do not challenge the amount or adequacy of the benefits available to them; they seek equal and meaningful access to benefits already available to them."); *Henrietta D. v. Giuliani*, 95 CV 0641, 1996 U.S. Dist. LEXIS 22373 (E.D.N.Y. Oct. 25, 1996). Plaintiffs have made no claim under the ADA or the Rehab. Act for additional or better benefits and services than provided to the non-disabled. To the contrary, plaintiffs' ADA and Rehab Act claims seek meaningful access to the *very same benefits and services* provided to the non-disabled. Plaintiffs seek, and this Court requires, only the modifications—such as intensive case management and low case manager-to-client ratios—required to ensure meaningful access to the same benefits and services.

■ 161. Second, City defendants argued that plaintiffs must show disparate treatment to prevail, asserting that "[t]he law is a comparison between what they are getting and what the non-disabled population is getting ...." Tr. at 650:22–24. This is incorrect. Once it is determined that the underlying benefits are provided to all, the only remaining question is whether defendants have made the reasonable accommodations required to ensure plaintiffs meaningful access to those benefits. *Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

162. The reasonable accommodation concept embodied in the federal disability statutes is meant to address the unique hurdles that people with disabilities face, and it recognizes that mere equality of treatment is not enough. *See, e.g., Dopico*, 687 F.2d at 652 ("It is not enough to open the door for the handicapped...; a ramp must be built so the door can be

---

**20.** Low case manager-to-client ratios are a reasonable modification that plaintiffs have urged as necessary under federal law to ensure them "meaningful and equal access to HRA benefits and services" from the beginning of this case—fully two years before The DASIS Law was enacted. *See* Second Am. Compl. ¶ 49 (Mar. 25, 1995). The fact that a legislative body subsequently mandated compliance with such ratios in light of the disability provides strong evidence of the reasonableness of the relief that plaintiffs seek.

**21.** Plaintiffs' expert Dr. Ernest Drucker conducted a discrete study in 1998 in which he concluded that defendants failed to provide DASIS clients with one benefit—enhanced rental assistance—within the legally-mandated time in 77% of the cases studied. Defendants did not proffer any evidence to dispute this study, and their own data, introduced at trial, confirmed that, for the last quarter of 1999, DASIS failed timely to provide this benefit to all eligible DASIS clients 32% of the time, by DASIS' own figures.

**22.** The Court will not that nutritional supplements and transportation allowances act as reasonable modifications allowing persons with AIDS and HIV access to their benefits, not as benefits additional to those received by the non-disabled public.

reached."); *Marisol A. v. Giuliani*, 929 F.Supp. 662, 685 (S.D.N.Y.1996), *aff'd* 126 F.3d 372 (2nd Cir.1997) ("[A] disabled individual is entitled to meaningful access to the benefits and services provided by a public agency .... Access alone ... is insufficient. Rather, a court may require an agency, under certain circumstances, to take affirmative steps to ensure that the access is meaningful."); 45 C.F.R. Pt. 84, App. A, at 336 (1997) ("[I]n order to meet the individual needs of handicapped persons to the same extent that the corresponding needs of nonhandicapped persons are met, adjustments to regular programs or the provision of different programs may sometimes be necessary.").[23]

■ 163. Quite simply, plaintiffs' claim is based upon defendants' failure to provide them reasonable accommodations, and not upon disparate treatment. Plaintiffs have alleged, and demonstrated, that defendants have failed to provide them with the reasonable accommodations required by the federal disability statutes, thus failing to ensure them meaningful access to the benefits to which they are entitled. A comparison with the manner in which benefits are administered to the non-disabled is thus not required, for the question of equality of administration is irrelevant to a claim for reasonable accommodations. This is, in fact, a well-established distinction. *See, e.g., Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283 (7th Cir.1996) ("[T]his is not a disparate treatment claim, but a reasonable accommodation claim, and it must be analyzed differently. [Plaintiff] is not complaining that [defendant] treated him differently and less favorably than other, non-disabled employees. *He is not comparing his treatment to that of any other [of defendant's] employees.* His complaint relates solely to defendant's failure to reasonably accommodate his disability.") (emphasis added)[24]; *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C.Cir.1998) (noting that reasonable accommodation claims rely on legal standards distinct from disparate treatment claims); *Cathcart v. Flagstar Corp.*, No. 97–1977, 1998 U.S.App. LEXIS 14496, at *27 (4th Cir.1998) ("Discrimination as used in the ADA prohibits not only disparate treatment ... but also the failure to make 'reasonable accommodations to the known physical or mental limitations of ... an applicant or employee.'") (citations omitted); *Franklin v. Consolidated Edison Co. of N.Y.*, 98 Civ. 2286, 1999 U.S. Dist. LEXIS 15582, at *27 (S.D.N.Y. Sept. 30, 1999); *Dunlap v. Association of Bay Area Gov'ts*, 996 F.Supp. 962, 965 (N.D.Cal.1998) ("A disability discrimination claim may be brought either on the theory that defendant failed to make reasonable accommodations or on a more conventional disparate treatment theory, or both. This is because the ADA not only protects against disparate treatment it also creates an affirmative duty in some circumstances to provide special, preferred

---

**23.** As Robert L. Burgdorf Jr., leading scholar on the Americans With Disabilities Act and author of the ADA bill submitted to Congress in 1988, explains:

> Identical treatment of people with and without disabilities, however, cannot address many of the dynamics that cause this type of discrimination. To say that everyone is treated equally is not an answer to the obstacle posed by a flight of stairs to many people with disabilities .... In fact, the Supreme Court of Washington has articulated that "[i]dentical treatment may be a source of discrimination." An identical treatment approach in regard to disabilities gives "the form, but not the substance, of equal opportunity."

Robert L. Burgdorf Jr., *"Substantially Limited" Protection from Disability Discrimination: The Special Treatment Model and Misconstructions of the Definition of Disability*, 42 Vill. L.Rev. 409, 524–25 (1997) (citation omitted).

**24.** The reasonable accommodation/modification requirement, upon which this case is based, is embodied in, and thus equally applicable to, all three Titles of the ADA, as these cases suggest.. This includes Title 11, which requires: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability ...." 28 C.F.R. § 35.130(b)(7).

treatment, or 'reasonable accommodation.' "); *Matthews v. Jefferson,* 29 F.Supp.2d 525, 532 (W.D.Ark.1998); *Connus v. Bethesda House Corp.,* No. 96–7081, 1997 WL 379169, at *2, 1997 U.S. Dist. LEXIS 9586, at *7 (E.D.Pa.1997) (Plaintiff can establish a claim under ADA "in one of the two ways established by the ADA," including disparate treatment and failure to provide a reasonable accommodation for his disability); *Mohamed v. Marriott Internat'l, Inc.,* 905 F.Supp. 141, 150–54 (S.D.N.Y.1995).[25]

164. Hence, defendants' failure to provide the reasonable modifications that plaintiffs require, without more, constitutes discrimination under the federal disability statutes. *See, e.g., Bultemeyer,* 100 F.3d at 1283 ("If it is true that [defendant] should have reasonably accommodated [plaintiffs] disability and did not, [defendant] has discriminated against him."); *Dunlap,* 996 F.Supp. at 966 ("The failure reasonably to accommodate, without more, constitutes 'discrimination' within the meaning of the ADA.") (citation omitted).

165. Plaintiffs have proffered extensive evidence that they have been denied meaningful access to critical subsistence benefits, in contravention of the law. Plaintiffs' evidence reveals an institution—DASIS—that is chronically and systematically unable to fulfill its function of providing plaintiffs with a "ramp" to the benefits and services essential to their survival. *See, e.g., Brown v. Giuliani,* 158 F.R.D. 251, 265 (E.D.N.Y.1994) ("For plaintiffs and members of the plaintiff class, public assistance benefits are the essential source of support that permit them to survive.") As

a result, plaintiffs have suffered and continue to suffer grave and irreparable harm, and they face imminent risk to their health, safety, and lives. *See, e.g., Reynolds v. Giuliani,* 35 F.Supp.2d 331, 340, *modified in part* 43 F.Supp.2d 492 (S.D.N.Y.1999) (issuing injunction and noting, "The City defendants' practices continue to endanger numerous individuals in need of public assistance, including . . . the disabled.") Under such circumstances, the issuance of an injunction is necessary and proper. *See, e.g., Brown,* 158 F.R.D. at 268 ("Where the standards for a preliminary injunction are met, it is this Court's obligation to enjoin actions of a governmental body which are in violation of the law.").

## III. Federal Benefits Claims

■ 166. Defendants have repeatedly violated clear requirements regarding the provision of Medicaid and Food Stamps. The first such requirement is that welfare benefits may only be terminated with notice and with good reason. *See* 42 C.F.R. § 435.919 (Medicaid notice); 7 C.F.R. § 273.13 (Food Stamps notice); 42 C.F.R. § 435.913(a) (inability to explain ineligibility for Medicaid). However, DASIS regularly terminated Medicaid and Food Stamps benefits without notice and without reason. For example, in 1994, 1995, 1996, and 1999, Mr. Bradley's Food Stamps and Medicaid were terminated five times without notice as subsequently determined by a fair hearing. *See supra,* ¶¶ 15, 17, 20, 22, 34. In 1998, Mr. Bradley finally received notice prior to a termination of benefits, but the notice was in-

---

**25.** As the court in *Matthews* explained:

The statute's language demonstrates a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender or race. Discrimination in the latter instances has been judicially defined as disparate treatment on the basis of a certain characteristic that identifies an individual as a member of a protected class. However, a person with a disability may be the victim of discrimination precisely be-

cause she did not receive disparate treatment when she need accommodation. In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory if their effect is to keep persons with disabilities from enjoying the benefits or services that, by law, must be available to them.

29 F.Supp.2d at 532 (citation and internal quotations omitted).

comprehensible, citing a numerical reason that no one at DASIS was able to explain. *See* 42 C.F.R. § 435.919 (Medicaid notice must comply with 42 C.F.R. § 431.210); 7 C.F.R. § 273.13 (Food Stamp notice must be in "easily understandable language"). *See supra,* ¶ 31. Once more, DASIS' decision was overturned. Similarly, DASIS terminated Mr. Greene's benefits without notice in November 1998 as determined in a subsequent fair hearing. *See supra,* ¶ 50. DASIS closed Mr. Torres' case in 1998 and again in April 1999. *See supra,* ¶¶ 62, 63. Both witnesses from community based organizations testified that closures without notice or explanation are frequent. (*See supra,* ¶¶ 86, 99.).

■ 167. Defendants also violated the requirement that, pending the outcome of a fair hearing, continuing aid and emergency Medicaid must be provided. *See* 42 C.F.R. § 435.930; N.Y. Soc. Serv. Law § 133. Again, the handling of Mr. Bradley's case exemplifies DASIS' gross failure. Mr. Bradley received absolutely no assistance from defendants while awaiting his successful fair hearings. *See supra,* ¶¶ 15, 18, 21.

168. Moreover, City defendant has failed to abide by fair hearing decisions and State defendant has failed to timely ensure compliance. On September 8, 1998, defendants were ordered to reinstate Mr. Bradley's Medicaid and Food Stamps and to grant retroactive Food Stamps. *See supra,* ¶¶ 30–32. Similarly, both witnesses from community based organizations testified that DASIS often—even in a majority of cases—fails to comply with fair hearing decisions for months or even over a year. *See supra,* ¶¶ 87, 100–102, 105.

169. Also, defendants have an obligation to effectively administer Food Stamp and Medicaid programs. *See* 42 C.F.R. § 435.930 ("The [state] agency must ... [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible ...."); 7 C.F.R. § 276.1(a)(4) ("State agencies shall be responsible for efficiently and effective-ly administering the [Food Stamp] Program ...."). This duty obviously requires that eligible individuals receive benefits from the programs. As both Mr. Bradley and Mr. Greene's cases demonstrate, defendants fail at this most basic level because eligible recipients regularly have Medicaid and Food Stamp benefits terminated without cause or effective recourse. *See supra,* ¶¶ 20, 22, 27, 29, 31, 35, 50.

■ 170. Thus, the Court finds that defendants have violated Federal law governing Medicaid and Food Stamps, as well as New York State Social Services law and regulations that implement these Federal programs, through consistent disregard of statutes protecting welfare benefits.

■ 171. The failure of DASIS to provide notice to their clients about the termination of their cases violates the due process guarantees of the Fourteenth Amendment. Since *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the law has recognized a person's interest in welfare benefits is a protected property interest. *Id.* at 261–262, 90 S.Ct. 1011. The Supreme Court held that the when welfare benefits are discontinued, "only a pretermination evidentiary hearing provides the recipient with procedural due process." *Id.* at 264, 90 S.Ct. 1011. Further, the recipient must have "timely and adequate notice detailing the reasons for a proposed termination." *Id.* at 267–268, 90 S.Ct. 1011. *See also Ford v. Shalala,* 87 F.Supp.2d 163, 175–176 (E.D.N.Y.1999); *Richardson v. Kelaher,* 1998 WL 812042 at *4–6 (S.D.N.Y. Nov.19, 1998).

172. The evidence adduced at trial demonstrates that not only has DASIS failed to give "timely and adequate notice," but that DASIS has repeatedly failed to give *any* notice whatsoever to their clients when their cases are closed and their benefits terminated. For example, in July 1996, Mr. Bradley won a fair hearing which ordered DASIS to restore his benefits. However, in September 1996, DASIS complied with the decision for only one

day, and then closed the case without notice to Mr. Bradley the very next day. *See supra,* ¶ 22. Following subsequent reopenings of the case, Mr. Bradley's case was again closed without notice in May 1999. *See supra,* ¶ 34. DASIS closed Mr. Greene's case without notice in September 1998, and he only discovered this two months after the fact. *See supra,* ¶ 50. Mr. Torres was only informed that his case had been closed in December 1998, almost a year after the fact. In January 1998, March 1998, August 1998, and September 1998, Mr. Torres directly contacted DASIS in connection with his application for permanent housing, but at no point during these meetings or at any time prior to December 1998 was Mr. Torres informed that his case had been closed. *See supra,* ¶¶ 57–62. DASIS again closed Mr. Torres' case in April 1999 without any notice. *See supra,* ¶ 63. Ms. Knox testified that she "had many, many cases where clients' cases have been terminated and they [the clients] had not been given notice." Tr. at 515:4–6. Ms. Bowman testified that in her estimation, "about thirty percent of the cases that I see, the clients have no idea why their case was closed." Tr. at 555:22–23. defendants have violated and continue to violate the due process rights of plaintiffs.[26]

173. Each time that DASIS terminated a class member's benefits without notice, and in violation of the due process clause, the nutrition and transportation supplement was among the benefits wrongfully terminated. Indeed, DASIS wrongfully terminated Mr. Bradley's benefits without notice, including the nutrition and transportation supplement, on numerous occasions. Mr. Bradley testified, moreover, that even after he won a fair hearing or-

dering DASIS to restore his lost benefits, DASIS failed to pay him the nutrition and transportation supplement. (*See supra,* ¶ 30.) Mr. Torres testified that he never received the nutrition and transportation supplement from DASIS. (*See supra,* ¶ 64.) And Ms. Lafontaine testified that although she was accepted as a DASIS client in January 1999, DASIS failed to inform her of her right to receive the nutrition and transportation supplement, or to provide her with the supplement until November 16, 1999. *See supra,* ¶ 68. DASIS has failed and continues to fail to provide this benefit to eligible recipients.

### State Defendant Liability

174. As this Court has previously ruled, under New York State law, State defendant has a duty to supervise City defendants in the provision of public benefits and services. *See Henrietta D.,* 81 F.Supp.2d at 433. Indeed, in the administration of public assistance funds, " 'the local commissioners act on behalf of and as agents for the State.' " *Id.* (quoting *Matter of Beaudoin v. Toia,* 45 N.Y.2d 343, 408 N.Y.S.2d 417, 380 N.E.2d 246, 247 (1978)). Hence, if City defendants have violated plaintiffs' rights under the federal disability statutes, then State defendant, as City defendants' principal, and as their supervisor, is also liable. *See, e.g., Brown v. Giuliani,* 158 F.R.D. 251, 256 (E.D.N.Y. 1994); *Morel v. Giuliani,* 927 F.Supp. 622, 627 (S.D.N.Y.1995).

175. In the summary judgment decision, this Court noted that "the State has not come forward with evidence of reasonable modifications made with the intent to insure equal and meaningful access to the provision of services for people with

---

**26.** The due process clause of the New York Constitution also provides: "No person shall be deprived of life liberty or property without due process of law." N.Y. Const. Art. I, § 6. The clause is given similar meaning as the Fifth and Fourteenth Amendments of the United States Constitution, and therefore any due process violation under the Federal standard violates the State constitution. *Cf. Met-* *ropolitan Life Ins. Co. v. N.Y. State Labor Relations Bd.,* 280 N.Y. 194, 20 N.E.2d 390 (1939) ("Due process for us is the same due process to which the Federal Congress is subject...."); 20 N.Y.Jur.2d § 387 ("The impact of the [due process] provisions is the same ...."). Accordingly, defendants are also in violation of the state constitution.

AIDS." *Id.* at 433. At trial, State defendant failed to proffer any evidence to controvert plaintiffs' proof, or to demonstrate State defendant's efforts at ensuring compliance with the federal disability statutes, but argued that the very presence of a fair hearing system suffices to fulfill State defendant's duty to supervise City defendants. Tr. at 652:16–17. This argument fails for several reasons.

176. First, City defendants' ongoing, systemic violations of the law demonstrate that State defendant has failed properly to supervise City defendants. As City defendants' principal, moreover, State defendant is liable for the actions of its agents, City defendants. Second, as discussed above, the evidence adduced at trial—from the individual witnesses, from representatives of community-based organizations, and from City defendants' own witness—demonstrate that the fair hearing mechanism has been wholly ineffective in assuring meaningful access to the benefits and services for which plaintiffs are fully eligible. Even where plaintiffs prevail at fair hearings, the evidence shows that City defendants often delay compliance with the courts' directives or ignore the decisions altogether. *See supra,* ¶¶ 19, 21–24, 87, 100–102.

177. Third, State defendant provided no evidence to demonstrate that the fair hearing process is available to challenge many of the problems plaintiffs face, including DASIS' lack of responsiveness, its failure to comply with legal deadlines, and its failure to provide intensive case management services.[27] Finally, desperately ill and impoverished clients should not be forced to pursue legal recourse each time their rights are violated. Proper supervision means, at the very least, ensuring that the widespread violations evidenced at trial, which give rise to the fair hearings, do not occur in the first place. The fact that fair hearings are available in some circumstances is thus no defense to a claim of systemic and widespread violations of plaintiffs' rights. Accordingly, State defendant is liable under the federal disability acts.

## IV.  State Law Claims

### Article XVII of the New York State Constitution

178. Section 1 of Article XVII of the New York State Constitution provides: "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine."[28] As the New York Court of Appeals has explained, "[i]n New York State, the provision for assistance to the needy is not a matter of legislative grace; rather, it is specifically mandated by our Constitution." *Tucker v. Toia,* 43 N.Y.2d 1, 7, 400 N.Y.S.2d 728, 371 N.E.2d 449, 451 (1977). Section 1 of Article XVII, the Court further explained, was adopted "in the aftermath of the great depression," and "it was intended as an expression of a positive duty upon the State to aid the needy." *Id.* Hence, the New York State Constitution "imposes upon the State an affirmative duty to aid the needy," and "[s]uch a definite constitu-

---

**27.**  The claims in this case under the disability acts are in no way precluded because a local statute requires DASIS to provide intensive case management with respect to all of the benefits and services that DASIS administers. Indeed, plaintiffs have argued that this modification is necessary under both the ADA and the Rehab. Act from the inception of this case. (*See* Second Am. Compl., ¶¶ 3–4, dated March 25, 1995.) The choice by the New York City Council to codify this requirement for DASIS clients after the inception of this case forcefully supports the claim that this is a reasonable, and necessary, modification.

**28.**  Additionally, Section 3 of Article XVII provides: "The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature may from time to time determine."

tional mandate cannot be ignored or easily evaded in either its letter or its spirit." *Tucker*, 400 N.Y.S.2d 728, 371 N.E.2d at 452; *accord Lee v. Smith*, 43 N.Y.2d 453, 402 N.Y.S.2d 351, 373 N.E.2d 247, 250 (1977); *Wilkins v. Perales*, 128 Misc.2d 265, 268, 487 N.Y.S.2d 961, 964 (N.Y.Sup. Ct.1985), *aff'd* 119 A.D.2d 1018, 501 N.Y.S.2d 549 (1st Dept.1986). Finally, the New York Court of Appeals has held that where "existing conditions violate an individual's constitutional rights," defendants cannot argue that the failure to alter those conditions is justified by lack of staff or facilities. *Klostermann v. Cuomo*, 61 N.Y.2d 525, 475 N.Y.S.2d 247, 463 N.E.2d 588, 594 (1984); *see Doe v. Dinkins*, 192 A.D.2d 270, 276, 600 N.Y.S.2d 939, 943 (1st Dept.1993) ("The plaintiffs seek to have the municipal defendants comply with their statutory and constitutional obligations. Any inconvenience caused by compliance is outweighed by the harm which would be suffered otherwise.").

179. Plaintiffs in this case are all residents of the State of New York and are entitled to the protections of its Constitution. N.Y. Const. Art. 1, § 1. All of the plaintiffs require public assistance and have thus been classified as "needy" by the State Legislature. *See* N.Y. Soc. Serv. Law §§ 62, 131. defendants, in turn, are responsible for ensuring that the State fulfills its constitutional obligations to provide for the needy through the provision of federal, state, and local programs to assist the needy. The evidence adduced at trial demonstrates that defendants are failing to fulfill their duty. The widespread and systemic failure to provide plaintiffs with meaningful access to critical subsistence benefits, detailed above, evidences an alarming failure to provide for the needy—indeed, for some of the neediest of New York's residents. As one court has explained:

> [T]he Constitution of the State of New York and statutes enacted pursuant to it make each New Yorker the beneficiary of a right not to be hungry, unclothed, or homeless. To the extent that residents of the State *are* hungry, unclothed, or homeless, then the governmental authorities are falling short of their obligations.

*Davis v. Perales*, 137 Misc.2d 649, 520 N.Y.S.2d 925, 928 (N.Y.Sup.Ct.1987). Here, the City and the State are falling short of their obligations in all of these categories. Defendants' failure properly to assist plaintiffs in accessing and maintaining their food stamps and public assistance benefits, and defendants' failure properly to budget clients' benefits has caused, and threatens further to cause, plaintiffs to go hungry. *See supra*, ¶¶ 18, 85, 98. Defendants' own figures, moreover, demonstrate a systematic failure to provide plaintiffs with the clothing allotments to which they are entitled. Indeed, in the Greenwood center, for the last quarter of 1999, DASIS took an *average* of *over forty days* from the date of completed application to provide eligible applicants with a clothing allotment, a crucial benefit for those who have been ravaged by AIDS. *See* Pl.Ex. 5C at 21. The applicable law requires that such benefits be provided no later than *twenty business days* following the submission of a completed application. *See* N.Y. City Admin. Code §§ 21–128(c)(2). DASIS' own figures thus establish that DASIS is failing to comply with the law as a matter of course, placing its clients at imminent risk of going "unclothed." *See Davis*, 520 N.Y.S.2d at 928.

180. Finally, DASIS' failure timely to provide eligible clients with rental arrears in compliance with the law threatens plaintiffs' housing situations. As noted, by defendants' own figures, the Waverly DASIS center took an *average* of *seventy-nine days* from the date of a completed application for client share rental arrears to the issuance of the benefit. *See* Pl.Ex. 5C at 22; *see* discussion *supra*. This is compounded by DASIS' failure to assist clients in locating permanent housing, as attested by both clients (this includes Mr. Bradley, Mr. Torres, and Ms. Lafontaine), and by

community-based witnesses. *See supra,* ¶¶ 20, 57–62, 69, 71, 81, 95–96. Finally, this is compounded by DASIS' failure timely to provide rent on new apartments for eligible clients, system-wide, 32% of the time, by DASIS' own figures. *See* Pl.Ex. 203 at 2. To take one example, Mr. Torres was homeless when he located an apartment in Coney Island, Brooklyn. He submitted an application and the requisite documentation for this apartment to his DASIS case manager. DASIS took two months to process his application. Mr. Torres lost the apartment and was forced to remain homeless. *See supra,* ¶ 57.

181. For the foregoing reasons, this Court finds that defendants have violated plaintiffs' rights under the New York State Constitution.

### NYCRR Title 18, Section 303.1

182. Title 18, Section 303.1 of the New York City Rules and Regulations provides, in relevant part: "No social services district or official shall establish or apply any policy or practice which would have the effect of discriminating against an individual because of ... handicap. This prohibition shall apply to all aid, care, services, benefits or privileges provided directly, or indirectly..." 18 N.Y.C.R.R. § 303.1(a). This statute also provides, in relevant part:

> In the provision of public assistance...no social services district or any member of its staff shall, on the basis of...handicap: (1) deny an individual any aid, care, services, other benefits or privileges provided by the district; ... (4) restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any aid, care, services, other benefits or privileges;...(6) deny any individual an opportunity to participate in a program through the provision of services ....

18 N.Y.C.R.R. § 303.1(b)(1), (4), (6). Finally, Section 303.7 of the statute provides that "the term handicap includes being diagnosed as having AIDS, testing positive for HIV infection, or being perceived as susceptible to AIDS or HIV infection." 18 N.Y.C.R.R. § 303.7.

183. Owing to the similarities in language and purpose between the federal disability acts and anti-discrimination provisions of the New York City Rules and Regulations, violation of plaintiffs' rights under the former is sufficient to constitute a violation of plaintiffs' rights under the latter. Therefore, this Court finds that City defendants have violated plaintiffs' rights under Title 18, Section 303.1 of the New York City Rules and Regulations.

### Other State Law Claims

184. *Application for Assistance.* The New York Social Services Law requires that when City Defendants receive an application for assistance, they investigate the circumstances of the applicant to determine the assistance or care that the applicant requires. N.Y. Soc. Serv. Law § 132. The law requires that "[a]ll applications [for public assistance] shall be processed promptly." 18 N.Y.C.R.R. § 351.8.

185. *Immediate Need.* The New York Social Services Law requires that "[I]f it shall appear that a person is in immediate need, temporary assistance or care shall be granted pending completion of an investigation." N.Y.Soc. Serv. Law. § 133.

186. *Emergency Assistance.* The New York Social Services Law requires that "each social services district shall furnish emergency assistance to aged, blind and disabled persons eligible therefor who reside in such district." N.Y. Soc. Serv. Law § 301. Emergency assistance shall be granted to a disabled person who applies for such assistance and who has needs that cannot be met by the monthly SSI benefit or other specified resources and that, "if not met, would endanger the health, welfare or safety of the individual." N.Y. Soc. Serv. Law § 302. Such needs are, among other things, replacement or repair of clothing, furniture, food, fuel and shelter. N.Y. Soc. Serv. Law § 303. New York Rules and Regulations similarly requires

the provision of emergency assistance to eligible disabled persons with emergency needs, including, e.g., replacement or repair of clothing, furniture, food, fuel and shelter; household moving expenses; rent security deposits; and brokers' fees. 18 N.Y.C.R.R. § 397.1.

■ 187. The evidence adduced at trial demonstrates that City defendants are in violation of these provisions. Data from City defendants' own database demonstrates that City Defendant systemically violate the requirement that "all applications shall be processed promptly." 18 N.Y.C.R.R. § 351.8.

188. Moreover, the representative class members demonstrated that when they clearly had immediate needs, City defendants failed to provide them with temporary assistance, in violation of Section 133 of the New York Social Services Law. For example, Mr. Bradley was constantly in immediate need of assistance in several categories. Repeatedly, and for prolonged periods of time, Mr. Bradley was in immediate need of assistance with his Medicaid, Food Stamps, rent, utilities, and cash assistance. DASIS failed to assist him on each occasion, forcing Mr. Bradley each time to pursue the long and arduous route of seeking a fair hearing to compel the restoration of his benefits. *See supra,* ¶¶ 18–19, 21–22. To take another example, Ms. Lafontaine was deprived of her Food Stamps for two months. *See supra,* ¶ 72. When Ms. Lafontaine asked her DASIS case manager for assistance, her case manager failed to provide her with temporary assistance, informing Ms. Lafontaine that "she couldn't do anything because the food stamps come from Albany." *Id.*

189. Finally, City defendants have failed to provide Plaintiffs with emergency assistance within the legal time frames. Under state regulations and New York law, DASIS must make an eligibility determination with regard to emergency benefits within 48 hours of the submission of a completed application, and must issue the benefits within 72 hours of the submission.

*See* N.Y. Dept. of Soc. Serv. Directives 86 ADM–7; *Hernandez v. Hammons,* 239 A.D.2d 192, 194, 657 N.Y.S.2d 170 (1st Dept.1997) (observing that 86 ADM–7 imposes a 48–hour/72–hour time frame for determining eligibility and awarding emergency benefits). As noted, DASIS fails to separate emergency applications form non-emergency application for approving and providing such benefits as rental arrears, home establishment, and clothing allotments. *See* Pl.Ex. 5C at 16–25. The evidence adduced at trial, however, demonstrates that City Defendants fail to provide all such benefits within *thirty days,* system-wide, in 33% of all cases. *See* Pl.Ex. 203 at 1. This figure includes emergency applications, Tr. 875–76, suggesting that DASIS is also in violation of the legally mandated 72–hour time frame in providing plaintiffs with emergency benefits.

## V. Attorneys Fees

■ 190. Plaintiffs have sought attorney's fees and costs in this action. Second Am. Compl. at 55. Both the ADA and the Rehab Act expressly permit a court to award attorney's fees and costs to a prevailing party. *See* 42 U.S.C. § 12205; 29 U.S.C. § 794a(b). Having prevailed in this case of public significance, plaintiffs will be awarded attorney's fees and costs. This matter is hereby referred to the Magistrate for a report and recommendation as to the amount of attorneys' fees that is reasonable in this case.

## REMEDIES

In accordance with the Findings of Fact and Conclusions of Law filed herein, it is this 18th day of September, 2000:

ORDERED, ADJUDGED, AND DECLARED as follows:

1. Pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 54, 57 and 58 of the Federal Rules of Civil Procedure, this Court declares that City Defendants have violated Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.*

and its implementing regulations; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its implementing regulations; 42 U.S.C. §§ 1396(a)(8), (a)(19), and 460.2(a), 42 C.F.R. §§ 435.911(a) and (b), and 7 C.F.R. § 273.2, and 42 C.F.R. § 206.10(a)(i); New York State Social Services Law and implementing regulations and administrative directives; the Due Process clause of the New York State and United States Constitutions; and Article XVII, Sections 1 and 3 of the New York State Constitution.

2. Pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 54, 57 and 58 of the Federal Rules of Civil Procedure the State Defendant has violated Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.* and its implementing regulations and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its implementing regulations;

IT IS FURTHER ADJUDGED, ORDERED, AND DECREED that

3. This Court retains full jurisdiction over compliance with this judgment.

4. This Court shall appoint the Honorable Cheryl L. Pollak, United States Magistrate Judge to will monitor compliance with the terms of this order for a period of three years from this date. Magistrate Judge Pollak shall have the power to compel compliance with the requirements of this judgment, and to recommend penalties and sanctions in the event of noncompliance.

## CONCLUSION

For the foregoing reasons, this Court has found in favor of the plaintiffs. The Clerk of the Court is directed that this order closes this case.

SO ORDERED.